623 So.2d 217 (1993)
Roy ODOM and Shirley Odom, Plaintiffs-Appellants,
v.
CLAIBORNE ELECTRIC COOPERATIVE, INC., et al., Defendants-Appellees.
No. 24909-CA.
Court of Appeal of Louisiana, Second Circuit.
August 18, 1993.
*219 Mayer, Smith & Roberts by Alex S. Lyons, Shreveport, for plaintiffs-appellants, Roy and Shirley Odom.
Lunn, Irion, Johnson, Salley & Carlisle by Brian D. Smith, Shreveport, for defendant-appellee, Claiborne Elec. Co-op, Inc.
Before SEXTON, HIGHTOWER and WILLIAMS, JJ.
SEXTON, Judge.
Plaintiffs, Roy & Shirley Odom, appeal a jury's award of damages for injuries which Mrs. Odom received in an automobile accident caused by the defendants, M.C. Williams and Claiborne Electric Cooperative, Inc. We amend the judgment to include *220 damages for loss of consortium and affirm, as amended.

FACTS
On December 6, 1987, M.C. Williams was called into work at noon by his employer, Claiborne Electric Cooperative, Inc. Significant thunderstorms had knocked out power in many areas that day and Mr. Williams was sent into the field in his Claiborne Electric pickup truck to locate any downed power lines. Mr. Williams used a spotlight in his truck to look at the power lines as he drove down different roadways.
It was still raining around 5:00 p.m. when Mr. Williams approached a 90-degree curve on Highway 179 South. Mr. Williams was traveling at 25 miles per hour when he entered this curve and applied his brakes. His truck began to skid, and his vehicle slid to the other side of the road where it collided with a 1989 Ford Crown Victoria, which was driven by Roy Odom. Mr. Odom had noticed that the truck was on the wrong side of the road and had attempted to pull his vehicle onto the shoulder of the road to avoid the accident. Roy's wife, Shirley Odom, was a passenger in the Ford. She was wearing her seat belt when the accident occurred. However, she felt immediate pain in her neck and her left arm and her fingers started going numb after the accident. An ambulance brought Mrs. Odom to the North Claiborne Hospital in Haynesville, where she was treated by Dr. Samuel Abshire for acute cervical myoligamentous strain with possible neuropathy. After three days, Mrs. Odom was discharged from the hospital, although she was still experiencing neck pain.
Following the accident, Mrs. Odom saw Dr. Abshire and his partner, Dr. Edward Butler, for several checkups. After a visit on January 15, 1988, Dr. Abshire referred Mrs. Odom to Dr. Robert Schwendimann, a neurologist, for evaluation. Nerve conduction studies performed by Dr. Schwendimann on February 15, 1988, were essentially normal except for a slight delay through the thoracic outlet. The electromyogram showed minimal changes in muscles that are supplied by the C5-C6 nerve roots. Mrs. Odom was placed on a program of physical therapy. The physical therapy program did not bring any benefit to Mrs. Odom, and the pain in her neck increased. Mrs. Odom continued to see Drs. Abshire, Butler, and Schwendimann. Dr. Abshire changed her pain medication to Flexiril, and on July 26, 1988, Mrs. Odom reported that the new medication was very successful in controlling her neck pain and muscle spasms. Dr. Abshire reported that the patient's range of motion through the cervical spine was markedly improved with only minimal subjective pain. In October of 1988, Mrs. Odom again went to see Dr. Schwendimann because of tingling sensations in her left hand. Dr. Schwendimann recommended an MRI, which was performed on November 4, 1988. Dr. Schwendimann felt that the MRI showed a soft disc herniation at the C7-T1 level and some degenerative changes in the C5-C6 level. Mrs. Odom was then referred to a neurosurgeon, Dr. George Martinez.
Dr. Martinez was of the opinion that the MRI showed that Mrs. Odom had a herniated disc at the C5-C6 level. On February 21, 1989, Dr. Martinez performed an operation on Mrs. Odom in which he removed the cervical disc at C5-C6 and fused that level. Mrs. Odom's condition improved and X-rays showed an excellent fusion. She was released from Dr. Martinez's care in August of 1989 with a 14 percent permanent disability rating. On October 27, 1989, Mrs. Odom returned to Dr. Martinez complaining of headaches, discomfort in the cervical region and mild intermittent pain in her right arm. Dr. Martinez referred Mrs. Odom back to Dr. Schwendimann.
When Dr. Schwendimann began treating Mrs. Odom again in January 1990, she was again complaining of headaches, pain in the neck, and radiating pain down the left arm into the fingers. She told Dr. Schwendimann that after the surgery she had improved, but after she had been released to return to normal work activities, the same symptoms reappeared. Dr. Schwendimann also noticed that Mrs. Odom was now suffering from hoarseness and her voice was slightly lower in pitch. Concerned about the change in her voice, Dr. Schwendimann referred Mrs. Odom to Dr. Roy Fleniken, an otolaryngologist. Dr. Fleniken discovered edema on *221 Mrs. Odom's right true vocal chord and a polyp on her left true vocal chord. Dr. Fleniken surgically removed the polyp from Mrs. Odom's vocal chord and returned her to Dr. Schwendimann's care. Dr. Schwendimann continued to treat Mrs. Odom up through the date of trial. During that time, she consistently complained of headaches, neck pain, and radiating pain down the left arm into the fingers.
On September 12, 1988, Roy and Shirley Odom filed suit naming M.C. Williams, Claiborne Electric Cooperative, Inc., and Federated Royal Electric Insurance Corporation as defendants. The defendants answered the petition alleging comparative negligence on the part of plaintiffs. The defendants also contended a defective roadway was the cause of the accident, thereby making the Claiborne Parish Police Jury a party to the suit. On September 12, 1991, after a trial on the merits, the jury found that M.C. Williams was 100 percent at fault in causing the accident. The following damages were awarded:

1) Medical expenses, past and future....................................$18,381.03
2) Physical injury, pain, suffering, and mental anguish, past and future,
 and permanent disability.............................................18,500.00
3) Past lost earnings and future lost earning capacity................... 7,500.00
4) Value of housekeeping services, past and future....................... 810.25
5) Property damage to automobile and cost of rental unit................. 1,852.01
6) Loss of consortium to Roy Odom........................................ -0-

A final judgment was signed on December 18, 1991. Plaintiffs filed a motion for a judgment notwithstanding the verdict or in the alternative, a motion for new trial. These motions were denied by the trial court on May 5, 1992. Plaintiffs now appeal asserting that all of the jury's awards for damages, except for its award for property damage to the automobile, were abusively low.

GENERAL DAMAGES
Plaintiffs contend the jury's award for general damages was inadequate and an abuse of its discretion. Plaintiffs contend that all the medical testimony presented at trial relates Mrs. Odom's injuries to the December 6, 1987, automobile accident. Plaintiffs contend this automobile accident caused Shirley Odom to suffer two herniated discs, at the C5-C6 level and at the C7-T1 level. The C5-C6 herniated disc required surgical removal and fusion. Plaintiffs assert the accident caused an immediate onset of headaches, neck pain, and radiating pain down the left arm, which have continued practically unabated to this date. Plaintiffs contend that Mrs. Odom's condition is permanent and will not improve. Considering the severity and duration of Shirley Odom's pain, suffering, and permanent disability, plaintiffs assert the award for general damages should be substantially increased.
General damages are those which may not be fixed with pecuniary exactitude. They instead involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitively measured in monetary terms. Anderson v. Bennett Wood Fabricators, 571 So.2d 780 (La.App. 2d Cir.1990), writ denied, 573 So.2d 1135 (La.1991).
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its evaluations and inferences are as reasonable. The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced *222 that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
In assessing the award for general damages in the instant case, it is apparent the jury concluded that neither of Mrs. Odom's herniated discs was caused by the December 1987 automobile accident. The question on appeal is whether this finding of fact by the jury was "manifestly erroneous" or "clearly wrong."
The medical evidence indicated that Shirley Odom had a long history of degenerative back problems prior to the accident in 1987. Dr. Abshire testified that Dr. Butler treated Shirley Odom on November 18, 1971, for pain in her neck and right shoulder and arm. Dr. Butler diagnosed myositis of the right nuchal musculature and a possible herniated disc. On February 3, 1972, Mrs. Odom reported soreness in her right ribs because a cow had hit her approximately one month earlier. On March 27, 1972, Dr. Stan Shelby performed surgery by removing part of Mrs. Odom's first right rib to correct her thoracic outlet syndrome. Shirley Odom saw Dr. Butler again on May 18, 1972, complaining of nerve numbness. On February 26, 1973, Dr. Butler reported that Mrs. Odom had hurt the back of her neck and had pain in the C7-T1 level. Dr. Butler prescribed a muscle relaxant, but Mrs. Odom returned on two different occasions with her neck still very stiff. Dr. Butler reported a lateral X-ray taken on March 8, 1973, revealed a questionable chip fracture or spur of the spinous process at C6. She was treated with medication and told to wear a cervical neck collar. Dr. Butler's records also contained a letter from Dr. W. Fox, dated March 30, 1973, which indicated that Mrs. Odom hurt her neck while trying to lift an object weighing 200 pounds. Dr. Fox diagnosed Mrs. Odom's injury as myositis to the right of T1 producing some cervical sprain symptoms. On February 14, Dr. Butler diagnosed Mrs. Odom with myositis (inflammation) of the neck trapezious muscle.
On January 15, 1975, Mrs. Odom had complaints of pain in her right arm and neck. On January 27, 1975, Mrs. Odom had complaints of acute lumbar strain caused by sneezing.
Mrs. Odom next reported pain in her shoulder on February 16, 1981. Dr. Butler prescribed a muscle relaxant and indicated that she possibly had a herniated disc. Mrs. Odom returned on February 19, 1981, at which time Dr. Butler diagnosed a probable herniated disc. On February 24, 1982, Mrs. Odom had pain radiating through her back. On June 1, 1982, Mrs. Odom was experiencing chest pain and radiating pain in her left arm. Dr. Butler saw Mrs. Odom again on July 1, 1982, and her condition had not improved. Dr. Butler reported that the patient definitely "had a disc." Mrs. Odom was given a muscle relaxant and cervical traction was initiated. On July 7, 1982, Mrs. Odom reported that her neck was better. Dr. Butler ordered her to continue the medication and traction. On March 2, 1984, Mrs. Odom once again returned to the clinic complaining of pain in her left chest and her left arm.
The next time Mrs. Odom reported complaints in her neck and arm areas was immediately following the December 6, 1987, accident. Dr. Abshire noticed a palpable muscle spasm in her neck and diagnosed Mrs. Odom with acute myoligamentous cervical strain with possible neuropathy. After three days in the hospital, Mrs. Odom was released and she continued to see Dr. Abshire and Dr. Butler for several checkups. On December 18, 1987, Dr. Butler reported Mrs. Odom was much better after a week of ultrasound therapy, although she still had pain. On January 15, 1988, Dr. Abshire noted questionable nerve root irritation at the C5-C6 level, and he referred Mrs. Odom to Dr. Robert Schwendimann, a neurologist.
Dr. Schwendimann performed nerve conduction studies on February 15, 1988. Mrs. Odom's electromyogram showed possible nerve root irritation, but her nerve conduction studies suggested significant delay across her thoracic outlet. X-rays showed possible degenerative changes at the C5-C6 vertebral level. Mrs. Odom was placed on a physical therapy program, but the program *223 caused the pain in her neck to increase. On March 1, 1988, Dr. Abshire examined the patient and he ruled out cervical nerve root injury. Dr. Schwendimann saw the patient on three occasions between March and July in 1988 and she continued to complain of pain in her neck and numbness in her fingers. Dr. Schwendimann continued conservative treatment with anti-inflammatory drugs and muscle relaxants.
On July 19, 1988, Mrs. Odom went to Dr. Abshire complaining of muscle spasms and headaches. Dr. Abshire changed her muscle relaxant to Flexiril, and Mrs. Odom was given ultrasound therapy. On July 26, 1988, Mrs. Odom came in for a follow-up visit. Dr. Abshire noted that the new medication was working quite well to control the patient's neck pain and muscle spasm. Dr. Abshire also reported that the patient's range of motion through the cervical spine was markedly improved with only minimal subjective pain. There was no pain in her lateral movements, no muscle spasms, and the trapezious exam was normal. Mrs. Odom next visited Dr. Schwendimann three months later in October of 1988 when she had complaints of tingling sensations in her left hand.
An MRI was performed on Mrs. Odom on November 4, 1988, almost 11 months after the accident. Dr. Schwendimann stated that the MRI showed a soft disc herniation at the C7-T1 level and a hard disc protrusion at the C5-C6 level. Dr. Schwendimann testified that the soft disc herniation was more likely to have been associated with the automobile accident than the degenerative changes shown at the C5-C6 level. Dr. Schwendimann had no doubt that the degenerative changes at the C5-C6 level preexisted the accident.
Mrs. Odom was then referred to a neurosurgeon, Dr. Martinez. Dr. Martinez testified the MRI showed a definite disc herniation at the C5-C6 level. Dr. Martinez felt that this was the cause of Mrs. Odom's physical complaints and that this level had been aggravated by the accident. Dr. Martinez surgically removed the disc at C5-C6 and fused that level on February 21, 1989. Mrs. Odom's neurological examinations after surgery were normal and she was released from Dr. Martinez's care in August of 1989. However, Mrs. Odom returned to Dr. Martinez in October of 1989 with the same complaints. Dr. Martinez then referred Mrs. Odom back to Dr. Schwendimann. A subsequent MRI done on February 5, 1991, showed an excellent fusion at the C5-C6 level and showed no disc bulging at the C7-T1 level.
Based on the foregoing medical evidence, the jury could have reasonably concluded that Mrs. Odom did not suffer a herniated disc as a result of the accident. There was significant evidence that the herniated disc at the C5-C6 level preexisted the accident. This fact was confirmed by the testimony of both Dr. Schwendimann and Dr. Martinez. Also, Dr. Schwendimann testified that X-rays taken on February 15, 1988, two months after the accident, showed no indication of any disc problem at the C7-T1 level. The MRI performed on February 5, 1991, also showed no problem at the C7-T1 level. Following the low-speed accident in which she was wearing her seat belt, Mrs. Odom was initially treated for severe muscle strain. The jury could have reasonably concluded that this injury was resolved by the time she visited Dr. Abshire on July 26, 1988. It was on this date that Mrs. Odom had improved range of motion throughout her spine and her headaches had ceased. Dr. Abshire reported the patient to be markedly improved and it was another three months before Mrs. Odom went to see another doctor. Thus, the jury could have found that Mrs. Odom's back surgery was not necessitated by the accident.
However, it is apparent from the medical testimony that the plaintiff's degenerative back condition was aggravated by the accident because she had been asymptomatic for at least three years prior to the accident. A victim is entitled to compensation for an aggravation of a preexisting condition or injury. Tobin v. Wal-Mart Stores, Inc., 575 So.2d 946 (La.App. 2d Cir.1991), writ denied, 580 So.2d 923 (La.1991). Where a defendant's negligent action aggravates a preexisting injury, he must compensate the victim for the full extent of the aggravation. Cook v. Wal-Mart Stores, Inc., 540 So.2d 1017 (La. App. 2d Cir.1989). The primary considerations in the assessment of damages are the *224 severity and duration of the injured party's pain and suffering. Tobin v. Wal-Mart Stores, Inc., supra.
In Zeagler v. Dillard Department Stores, Inc., 521 So.2d 766 (La.App. 2d Cir.1988), this court awarded $12,000 in general damages to a plaintiff whose preexisting degenerative disc disease predisposed her to permanent injuries. The plaintiff was injured when she fell at a department store and she suffered a four percent permanent disability. In Bruce v. Williams, 516 So.2d 1183 (La. App. 2d Cir.1987), plaintiff received a $20,000 general damage award when his preexisting degenerative disc condition was aggravated by a cervical strain which he received in a vehicular collision. In McGrew v. Jordan, 516 So.2d 1246 (La.App. 2d Cir.1987), plaintiff received a $15,000 general damage award when her chronic back problems were aggravated by a cervical and lumbar strain from an automobile accident. In light of the foregoing cases and the facts in the instant case, we conclude that the $18,500 general damage award is not inadequate and was not an abuse of the jury's discretion.

SPECIAL DAMAGES
In our discussion of special damages in the instant case, we are greatly influenced, as was the jury, by the fact that this was a low-speed collision in which the plaintiff was wearing her seat belt and there was only minor property damage to the vehicles. Also, as previously discussed, the jury's reasonable conclusion that Mrs. Odom's back surgery was not necessitated by injuries received from the accident plays a major role in our affirmance of the following awards.

Past and Future Medical Expenses
Plaintiffs contend the jury's award for past and future medical expenses was inadequate. The jury's award of $18,381.03 corresponded exactly to the medical expenses incurred prior to trial. Thus, plaintiffs specifically contend the jury abused its discretion by failing to make an award for future medical expenses. Plaintiffs contend the medical testimony of Mrs. Odom's treating physicians clearly establishes that she will incur future medical expenses because of injuries received from the accident.
An award for future medical expenses is in great measure highly speculative and not susceptible of calculation with mathematical certainty. However, like any other element of damages, future medical expenses must be established with some degree of certainty. Awards will not be made for future medical expenses which may or may not occur in the absence of medical testimony that they are indicated and setting out their probable costs. Hunt v. Board of Supervisors of Louisiana State University, 522 So.2d 1144 (La.App. 2d Cir.1988).
In the instant case, Dr. Abshire testified that Mrs. Odom would probably suffer some degree of pain in the future and possibly would require medication for this pain. He also stated that she might be able to manage some type of program through exercise so that she would not need medication or only use over-the-counter medicines. Dr. Schwendimann testified that it was more likely that Mrs. Odom would require future medical care, although he refused to speculate on the length of time this care would be required. Dr. Schwendimann testified that the MRI done on February 5, 1991, showed an excellent fusion at the C5-C6 level and did not show a disc bulging at the C7-T1 level. Dr. Martinez testified that Mrs. Odom's complaints of pain which started in August of 1989 were not related to the disc injury she sustained in the accident. After he performed surgery at the C5-C6 level, Dr. Martinez stated that Mrs. Odom's neurological examinations were always normal. Dr. Martinez testified that he could not say whether further degeneration would occur below the site of the fusion. Dr. Martinez also stated that he did not know if Mrs. Odom would need surgery again within the next ten years.
The foregoing factors considered, we conclude the jury did not abuse its discretion in the award of medical expenses.
Past Lost Earnings and Future Lost Earning Capacity
Plaintiffs contend that the jury's award for past lost earnings and future lost earning capacity was abusively low. Plaintiffs contend that Mrs. Odom's injuries have seriously *225 affected her ability to handle the beef cattle operation on their farm. Plaintiffs also assert that Mrs. Odom's injuries have prevented her from working with their poultry processing operation, forcing them to hire outside help. Plaintiffs contend the projections presented by their financial expert, Dr. Melvin Harju, were uncontradicted, and the jury's award for past lost earnings and future lost earning capacity should be increased.
Awards for loss of future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty. Thus, the courts must exercise sound judicial discretion in determining these awards and render awards which are consistent with the record and which work an injustice on neither party. Anderson v. Bennett Wood Fabricators, supra.
The factors to be considered in determining lost future income include the plaintiff's physical condition before and after his injury; his past work record and the consistency thereof; the amount the plaintiff probably would have earned absent the injury complained of; and the probability he would have continued to earn wages over the balance of his working life. A loss of future income award is not really predicated upon the difference between the plaintiff's earnings before and after a disabling injury. Such an award is predicated, more strictly considered, upon the difference between the plaintiff's earning capacity before and after a disabling injury. Anderson v. Bennett Wood Fabricators, supra.
The first question which must be addressed is the effect, if any, of the accident on Mrs. Odom's ability to work. In the instant case, none of Mrs. Odom's treating physicians restricted her from working, except for Dr. Martinez during the postoperative period in 1989. Instead, the doctors told her that she could perform any activities which did not cause her pain. Mrs. Odom testified that she is unable to work on the farm because the activity causes her neck to hurt. However, Dr. Martinez testified that after her surgery, the disc herniation problem at C5-C6 was resolved, and Mrs. Odom's range of motion in her neck was normal. Dr. Schwendimann testified that the nerve conduction test done on July 5, 1990, was completely normal. Mrs. Odom also testified that she has some good days where she does not have any pain.
At the time of the accident, the Odoms had not yet started their poultry farm. In fact, Mrs. Odom testified that there was little or no work going on at that time on the farm. Mr. Odom testified that the chicken farming would be less work and a lot less stressful on Mrs. Odom. There was no testimony that Mrs. Odom would have been capable of performing the work on the chicken farm by herself, which is currently being done by two hired employees. Mrs. Odom has not attempted to secure any type of employment since the accident.
Although Dr. Harju made his projections based on Mrs. Odom being paid $6.00 an hour, there was no evidence that Mrs. Odom ever earned this amount in either the beef farm operation or the poultry farm operation. In fact, the Odom's farming operation has lost less money each year since the accident, as evidenced by their income tax returns. Considering all of the above factors and, again, considering that the jury could have concluded that Mrs. Odom's disc problems did not stem from the accident, we conclude that the jury's award for lost earnings was not an abuse of discretion.

Housekeeping Services
Plaintiffs assert the jury's award for housekeeping services was inadequate. Plaintiffs contend the unrebutted evidence established that Roy Odom and some hired maids provided housekeeping services that Shirley Odom was not able to perform because of her injuries. Plaintiffs contend Mrs. Odom will not be able to perform these duties in the future because of her constant pain. Therefore, plaintiffs contend, based on the testimony of their expert, Dr. Harju, that they are entitled to a minimum award of $30,000 for past and future housekeeping services.
Louisiana law allows, as an element of damages, reasonable housekeeping expenses necessitated by the incapacity of an *226 injured spouse. Mims v. Reliance Insurance Company, 535 So.2d 1085 (La.App. 2d Cir.1988), Cushman v. Fireman's Fund Insurance Co., 401 So.2d 477 (La.App. 2d Cir. 1981).
In the instant case, the jury awarded plaintiffs $810.25 for the value of housekeeping services, past and future. This award corresponded exactly to the total amount that the Odoms paid to outside maids as substantiated by cancelled checks that were entered into evidence. Implicit in this award for housekeeping services was the jury's rejection of plaintiffs' claims that Mr. Odom should be paid for housekeeping services that he performed and that the Odoms will need housekeeping services in the future.
While the medical evidence does assign a 14 percent permanent disability to Mrs. Odom, the evidence does not support the contention that she will not be able to perform substantially all of the usual household duties of a homemaker. In fact, Shirley Odom testified that she is still able to do the cooking and washing at home. When she is sometimes unable to do any vacuuming or mopping, her husband has performed these domestic tasks. For one year prior to trial, the Odoms had a maid come to their home for approximately three hours per week. However, the plaintiffs were unable to provide any documentation regarding payments to this maid until January 16, 1989. The plaintiffs were also unable to provide any evidence of payments to a maid who was hired immediately after the accident. Considering the above facts, we conclude that the jury did not abuse its discretion in the award for loss of housekeeping services, past and future.

Loss of Consortium
Finally, plaintiffs contend the jury erred in denying Roy Odom's claim for loss of consortium.
The claim for loss of consortium is broken down into several components including loss of: (1) love and affection, (2) society and companionship, (3) sexual relations, (4) the right of performance of material services, (5) the right of support, (6) aid and assistance, and (7) felicity. Proof of any of these elements is sufficient for an award of consortium. Finley v. Bass, 478 So.2d 608 (La. App. 2d Cir.1985).
In the instant case, Roy Odom testified that since the accident, his wife's outlook has changed and that she was constantly in pain. This condition caused his wife to have several sleepless nights and she became very nervous and irritable. Roy Odom testified that he and his wife do not go out to dinner or go dancing as frequently because of his wife's pain. Mr. Odom also stated that they do not spend as much time together as they used to because Mrs. Odom is not able to work on the farm. Nevertheless, Mr. Odom testified that the accident has not changed the love and affection that he has for his wife. All of these facts were corroborated by the testimony of Mrs. Odom.
It is clear from the record that Mr. Odom demonstrated some loss of society and companionship and the loss of some happiness in his marriage since the accident. Therefore, the jury abused its discretion in failing to make an award for loss of consortium. Our review of the jurisprudence leads us to believe that the lowest loss of consortium award appropriate under the circumstances of this case is $1,500. Compare Warner v. Great Atlantic and Pacific Tea Company, Inc., 583 So.2d 61 (La.App. 2d Cir.1991); Cascio v. City of Monroe, 530 So.2d 1170 (La.App. 2d Cir.1988). Accordingly, the judgment is amended to include $1,500 in damages for loss of consortium.

CONCLUSION
The jury's awards for general damages, past and future medical expenses, past lost earnings and future lost earning capacity, and past and future housekeeping services are affirmed. The judgment is amended to include a $1,500 award for loss of consortium. The judgment appealed from, as amended, is affirmed. Costs of this appeal are assessed equally to plaintiffs and defendants.
AMENDED, AND AFFIRMED AS AMENDED.