CARAWAY, J.
 

 |,After a bench trial, the plaintiff was awarded $2,654,249.99 in this personal injury action for damages for a whiplash-like injury she sustained to her cervical spine when a dairy truck struck the front passenger side of her vehicle. The dairy appeals urging that plaintiff did not relate the cause of her condition to the motor vehicle accident, prove that she was disabled, or show the necessity for certain future medical procedures which accounted for the largest amount of the damage award. For the following reasons, we affirm, amend and reverse in part the judgment of the trial court.
 

 Facts
 

 On the morning of April 11, 2005, the 24-year-old plaintiff, Kristin Davis, was traveling to an elementary school for her first day of professional block student teaching. Davis’s car was struck by a Foremost Dairy truck which ran a stop sign and struck the front passenger side of her Dodge Stratus. Davis’s vehicle sustained damage to the right front window, right mirror and two front tires. Some time after the impact, Da-vis realized that she “was having a headache” and “pain in [her] neck and shoulders.” After she went home to get cleaned up, Davis’s parents took her to the emergency room at Glen-wood Regional Medical Center in West Monroe, where she reported a headache and pain in her upper back and between her shoulder blades. At the time, Davis was diagnosed with neck strain by Dr. Edward Calvert and given a work excuse through April 18, 2005. She was prescribed pain medication.
 

 Lin the four years between the accident and the time of trial in May of 2009, Davis sought the medical advice of numerous physicians and other medical personnel and made a large number of emergency room visits for complaints of pain. A detailed, chronological synopsis of her medi
 
 *982
 
 cal history is contained in the unpublished addendum to this opinion.
 

 In 2005, she saw chiropractor Greg Mayfield and family physicians Drs. David Hebert, Doyle Hamilton and Warren Daniel, for pain in her upper and lower back and headaches. Both Drs. Hebert and Hamilton expressed concern over Davis’s prescription drug use.
 
 [1]
 
 Davis also returned to the Glenwood emergency room two weeks after the accident with complaints of head and neck pain and made two visits to the St. Francis Medical Center emergency room in November and December of 2005, after falling down eight stairs and a fainting episode. In 2006, Davis reported to the St. Francis Medical Center emergency room eight times with complaints of neck and back pain.
 

 Davis began seeing Dr. Doug Brown, an orthopedist, in January of 2006. Dr. Brown diagnosed Davis with a bulging disc at C6-7 after an MRI in January of 2006 and a myelogram and CT scan in June of 2006 which revealed the condition. During 2006, Davis also consistently saw Dr. Doyle Hamilton seeking pain medication for neck and back pain. Dr. Hamilton ultimately discontinued Davis as a patient in October of 2006 due to his concerns over her prescription drug use. Davis began physical therapy in February of 2006 but stopped by May of 2006.
 

 Rln January of 2007, Davis reported to Dr. Brown that a school child had grabbed her by the neck, causing the onset of pain in the left arm and fingers. A second MRI was performed in January of 2007 and showed a progression of the degenera-five disc disease. Davis also continually saw Dr. Warren Daniel during 2007, and reported to the St. Francis emergency room two times with complaints of neck, arm and back pain. In March of 2007, she also saw neurosurgeon, Dr. Bernie McHugh, who referred her to pain specialist Dr. Vincent Forte. Davis began seeing Dr. Forte in April of 2007.
 

 After undergoing various procedures, Dr. Forte ultimately diagnosed Davis with C6-7 nerve impingement and facet joint problems. The facet joints are joints located in the posterior part of the neck that frequently cause pain. According to the physicians, it was literally through the process of elimination, by diagnostic procedures, that both of these diagnoses were made.
 

 Accordingly, during 2007, Davis received three steroid injections at C6-7, underwent a medial nerve block of the facet joint nerves, a discogram and a rhizotomy involving five facet joint nerves (C3,4,5,6 and 7).
 
 [2]
 
 In 2008, Davis underwent two more rhizotomy procedures. In 2009, Dr. Forte administered a trigger point injection
 
 [3]
 
 upon Davis and performed a fourth rhizotomy in May.
 

 |4The diagnosis of Davis’s condition, which she asserted at trial, is described in the opinions of Dr. Doug Brown, an orthopedic surgeon, and Dr. Vincent Forte, the pain management specialist. As noted above, Dr. Brown diagnosed the disc bulge at C6-7 and Dr. Forte diagnosed Davis with C6-7 nerve impingement and facet joint pain.
 

 
 *983
 
 Davis’s work history after the accident was equally eventful. Davis was able to complete her college education and student teaching in November of 2005 and graduated in December of 2005. Davis took a permanent job with the Ouachita Parish School Board on January 5, 2006. By February 15, 2006, work records document that Davis applied for sick days through March 17, 2006, due to cervical pain. Although Davis requested unspecified sick leave on two days in October and November of 2006, she worked full-time through December of 2006. A 2006 federal tax return shows that Davis reported $24,586 in income for 2006.
 

 After the child incident in January of 2007, Davis was granted extended leave from work from January 27 through May 24, 2007, the end of the school year. Davis did not return to teaching in the fall semester of 2007 or the spring semester of 2008. Her 2007 tax records show an income of $7,926. By the summer of 2008 after moving to Lafayette, Louisiana, Davis obtained a part-time job as a swim instructor at a rehabilitation center. In October of 2008, Davis secured a part-time administrative position at a private school in Lafayette where she continued to work through 2009. Documentation showed that Davis performed both administrative work at $12.50/hour and substitute teacher work at $45/day. A check stub dated IfiOctober 15-30, 2008, shows that Davis worked 56 hours at a rate of $12.50/hr. The 2008 tax records show that Davis earned $2,994 at the school and $1,060 at the rehabilitation clinic. Documentation showed that with a full-time administrative position at the private school, Davis would make approximately $25,000 a year.
 

 On April 10, 2006, Davis filed suit against the truck driver, Johnny Richardson, Dean Foods, Foremost Dairies and Southern Foods Group, L.P., seeking damages for injuries she allegedly sustained in the accident. Defendants admitted liability and the case proceeded to a bench trial on the issue of causation and damages. The defense raised the issue of whether Davis exaggerated her symptoms due to a prescription drug addiction. Additionally, the defense claimed that intervening and/or superseding events caused Davis’s long-term injuries.
 

 A two-day trial occurred in May of 2009. Live testimony included that of Kristin, her mother, a friend and an emergency room physician. Otherwise, the plaintiff submitted the deposition testimony of eight physicians, one addictionologist, a physical therapist and an economist as well as Davis’s medical and work records. The defendants presented no evidence, but relied on the cross-examination of plaintiffs witnesses. After the submission of several post-trial briefs to the court, judgment was rendered in favor of Davis awarding $300,000 general damages and $100,00 loss of enjoyment of life. The court also awarded Davis special damages as follows:
 

 Past Medical Damage.$ 120,337.88
 

 Car Rental.$ 676.11
 

 Past Lost Wages.$ 157,370.00
 

 Future Lost Wages.$ 734,795.00
 

 Past Household Services_$ 9,984.00
 

 Future Household Services .. $ 84,766.00
 

 Future Medical Expenses ... $1,146,321.00
 

 | ^Defendants appeal the $2,654,249.99 judgment raising arguments regarding causation of Davis’s injuries, the award of past and future lost wages, past and future household services and future medical expenses.
 

 Discussion
 

 I.
 

 Causation
 

 The defendants’ first assignment of error concerns the issue of causation. Specifically, they assert that the motor vehicle accident did not cause the bulging disc and facet injuries and any contrary conclusion
 
 *984
 
 is contradicted by the opinions of the treating physicians and the documentary evidence. Defendants point to Davis’s use of the narcotic pain medicine, Lortab, obtained simultaneously from two doctors before the accident for a questionable knee injury. For the seven months following the accident, defendants summarized the evidence as follows:
 

 By the late fall 2005, plaintiff displayed no objective symptom of injury, had perfectly normal diagnostic tests, had been dismissed by one physician for “doctor shopping,” had admitted to two health care providers (Mayfield and the physical therapist) that she was pain-free and healed, and had consumed thousands of prescription pain pills from multiple doctors and pharmacies.
 

 Defendants then point to Davis’s fall down the stairs in November of 2005 as the trauma which resulted in a significant change in her symptoms.
 

 |7In a personal injury action, the plaintiff bears the burden of proving a causal relationship between the injury sustained and the accident at issue.
 
 Maranto v. Goodyear Tire & Rubber Co.,
 
 94-2603, 94-2615 (La.2/20/95), 650 So.2d 757;
 
 Montgomery v. Kedgy,
 
 44,601 (La.App.2d Cir.8/26/09), 21 So.3d 980,
 
 unit denied,
 
 09-2110 (La.11/25/09), 22 So.3d 167. The plaintiff must prove causation by a preponderance of the evidence.
 
 Id.
 
 The test for proving the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the injuries were caused by the accident.
 
 Maranto, supra.
 
 A plaintiff is aided in proving causation by the presumption that an injury resulted from an accident if before the accident the injured person was in good health, but commencing with the accident the disabling symptoms appear and continuously manifest themselves afterward, provided that the medical evidence demonstrates a reasonable possibility of causal connection between the accident and the injury.
 
 Housley v. Cerise,
 
 579 So.2d 973 (La.1991);
 
 Montgomery, supra; Saunders v. ANPAC Louisiana Ins. Co.,
 
 43,405 (La.App.2d Cir.8/13/08), 988 So.2d 896.
 

 It is well-settled law that factual determinations are subject to review for manifest error.
 
 Howard v. Union Carbide Corp.
 
 09-2750 (La.10/19/10), 2010 WL 4074952;
 
 Ferrell v. Fireman’s Fund Ins. Co.,
 
 94-1252 (La.2/20/95), 650 So.2d 742. In such a review, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.
 
 Howard, supra;
 
 | s
 
 Stobart v. State through Dept. of Transp. and Dev.,
 
 617 So.2d 880 (La.1993). If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse, even though convinced that had it been sitting as the trier of fact it would have weighed the evidence differently.
 
 Id.
 
 Where there are two permissible views of the evidence, the factfin-der’s choice between them cannot be manifestly erroneous.
 
 Id.
 
 Further, where the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989). Indeed, where the factfinder’s determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous.
 
 Id.
 

 At trial, Davis testified that she consistently had pain in her cervical spine and shoulder blades since the April 2005 accident. Regarding her medical history, Davis reported that she had knee surgery in 1997 and was involved in another car
 
 *985
 
 accident in 2002 in which she hurt her neck.
 
 [4]
 
 She had no residual problems from either incident. Concerning her present condition, although she experienced periods of less pain, Davis testified that between the time of the accident and the trial, “it always went back to the same old thing.”
 

 Davis reported that at the time of her fall during Thanksgiving break in 2005, her shoulder blades and neck had been hurting for two days, and she had not left the house due to the pain. She also had a migraine Rheadache. She went down the stairs at some point, lost her footing on the steps and hit her head. Her parents took her to the emergency room where she saw Dr. Crook. She was able to go back to work the following Monday. Davis testified that the source of her problems was not the fall down the stairs but the car wreck because her symptoms were the same before and after the fall.
 

 When Davis began her permanent teaching job in Ouachita Parish in January of 2006, she also began seeing Dr. Doug Brown and underwent an MRI and myelo-gram during the year.
 
 [5]
 
 She then went to physical therapy at Wied Physical Therapy. Physical therapy temporarily alleviated her pain, but gave her no permanent relief. She was unable to bend over or get on the floor with her first graders. She began teaching first grade at Calhoun Elementary in the fall semester of 2006. She said she performed her duties while hurting. The pain was the same.
 

 Davis testified that she saw Dr. Brown a few days after an 8-year-old child grabbed her around the neck. While the incident aggravated things, she did not have any new symptoms. She claimed that in January of 2007, she was having difficulty working. She saw Dr. Warren Daniel in February of 2007, and he recommended that she be off of work for the rest of the school year. Davis obtained a leave of absence from work without pay from March 6, 2007, until the end of the school year. In late March of 2007, Davis saw neurosurgeon, Dr. Bernie McHugh, who referred her to pain | ^management specialist Dr. Vincent Forte. Dr. Forte gave her cortisone injections in her neck which gave her some relief. He performed a medial branch block which also provided temporary relief. Ultimately, Dr. Forte performed the rhizotomy procedures on her facet joints. She had her last nerve burn on May 5, 2009, two weeks prior to trial. Dr. Forte also performed a disco-gram.
 

 The depositions of chiropractor Greg Mayfield, Drs. David Hebert, Warren Daniel and Bernie McHugh were submitted into evidence and presented facts consistent with those set forth in the medical synopsis appended to this opinion.
 

 Dr. Doyle Hamilton testified in his deposition that he began seeing Davis in 2003 for weight loss issues. Davis had undergone knee surgery in 1999. He testified that on August 11, 2004, Davis for the first time requested narcotic pain medication for knee pain. Through 2005, Davis received both cough and pain medication from Dr. Hamilton for her chronic cough and knee pain. Regarding Davis’s visits to his office after the accident, beginning on May 26, 2005, Dr. Hamilton testified consistently with the information set forth in the medical synopsis. Additionally, Dr.
 
 *986
 
 Hamilton testified to his concern over Davis’s drug use at this time and beginning in August of 2004 because he knew that she was moving her prescriptions and seeing another physician who was prescribing pain medication to Davis. During July of 2005, Davis continued to take and request Ultram for unspecified pain.
 

 |uIn his deposition, Dr. Hamilton testified to his belief that Davis was “doctor shopping” in order to get prescription pain medication. Nevertheless, he agreed with the opinion of Dr. Brown that the accident caused her back and neck problems. Dr. Hamilton also testified that it was “likely” that a bulging disc and back pain would show up nine months after the motor vehicle accident.
 

 Orthopedic surgeon Dr. Doug Brown’s deposition was introduced into evidence. In it, Dr. Brown reviewed Davis’s medical records as set forth in the medical synopsis. Dr. Brown testified that in his opinion, Davis’s main injury was “damage to this disc” which “I truly believe it was in the accident just by the history and the way it looked.” Specifically, Dr. Brown stated that the April 14, 2005 accident “caused the C6-7 disc to bulge and be symptomatic for some period of time, and then later her neck was injured with — I think this child grabbing her neck and flexing it really made her more symptomatic at that time because she’d almost got completely well before then.” Dr. Brown also testified that the fall down the stairs could have aggravated what was already going on because the degenerative disc changes with the disc bulging that he saw on the MRI in January of 2006 take a minimum of 3 to 6 months to show. Dr. Brown stated that in his opinion, Davis’s problems were due to the disc bulge with nerve impingement (which responded to the epidural injections) and a cervical facet joint dysfunction (which responded to the nerve burn).
 

 Dr. Vincent Forte first diagnosed Davis with left disc bulge, generalized neck pain, muscle soreness and headaches based upon the | ^history given to him by Davis. Dr. Forte concurred in the conclusion that the myelogram showed evidence of C6-7 bulge. Ultimately, Dr. Forte concluded that Davis had nerve impingement and muscle soreness due to cervical facet joint problems, because Davis responded to treatment of both areas. He likened the cervical facet joint problems to whiplash which could be seen two years after an accident and could produce constant, even debilitating pain. Dr. Forte related these problems to the April 2005 accident although he knew of no other incidents. He could not say what caused the disc bulge, the accident or the November 2005 fall. He could not say, with a reasonable degree of medical certainty, when the disc bulge occurred.
 

 Dr. Forte explained the numerous procedures that had been done on Davis. Davis first underwent three cervical epidural steroid injections. Dr. Forte testified that during the cervical epidural steroid injections the patient is sedated. While the patient is under the x-ray machine, the doctor counts the disc spaces and injects steroids into epidural space hoping to reduce pain symptoms by reducing inflammation of the nerves.
 

 When the steroid injections provided little relief, Dr. Forte explained that Davis next received a cervical medial branch nerve block. He testified that the theory behind this procedure is that the nerves which innervate the facet joints may be causing pain. Thus, Dr. Forte injected local anesthetic at the point where the nerve passes near the posterior bone and blocks the nerve or the pain generators
 
 *987
 
 going into the joint with the hope of locating the pain source.
 

 11sDr. Forte explained that the nerve cauterization or rhizotomy procedure involved the use of a heated needle to stimulate and burn or cauterize the nerve for 90 seconds. Davis experienced notable pain relief after the rhizotomy. Dr. Forte explained that a rhizotomy may have to be repeated because
 

 you can very well get good stimulation with just having two or three millimeters contacting the nerve, but you may not get a very long burn of that nerve, so subsequently the nerve does regenerate, and so as this nerve regenerates, the pain symptomatologies m[a]y return, so quite often what we see is that some patients may get three months or six months or even up to two years of benefit after a rhizotomy, but we may often have to repeat it....
 

 After Davis’s first rhizotomy, Dr. Forte recommended a discogram to locate the source of any residual pain. Dr. Forte explained that the discogram is a procedure where a needle is placed in the disc space in order to inject the disc with a contrast agent and then ask the patient if the injection replicates pain. Davis also received trigger point injections which involves the injection of local anesthetic and steroids into muscle to reduce spasms.
 

 Dr. Forte also stated that Davis did not exhibit drug-seeking behavior during his treatment of her. His prognosis for Davis was that she would require the rhizotomy procedure at least every two years with trigger point injections in between. He testified that the facet joint problems could last more than two years after the accident. It was not uncommon for Davis’s symptoms to exhibit themselves at a later time or for the symptoms to get better, worse or be constant. Dr. Forte testified that Davis’s symptoms were consistent with her history of being injured in the automobile accident.
 

 114With the wide-ranging medical care that Davis sought in the four-year period following the accident, along with the varying diagnoses she received, the defendants’ arguments have support by one view of the evidence. That view shows that some of her doctors considered her to possibly be addicted to prescription drugs and doctor shopping to support the addiction. That view would focus further on Davis’s condition as reported to the medical providers in the seven months following the accident which indicated her recovery and her ability to adequately function and obtain her college degree. Thus, the defendants’ argument is that the only reasonable conclusion from the evidence is that Davis’s fall in November 2005 is the cause of her present condition. Moreover, from the defense perspective this same evidence must destroy Davis’s credibility.
 

 The trial court’s determination of causation relating Davis’s condition to the April of 2005 accident may rest, nevertheless, on the opinions of Drs. Brown and Forte. There was no MRI taken between the April accident and Davis’s fall down the stairs in November of 2005. The first MRI was in January of 2006, and Dr. Brown related the bulging disc shown by that test to an event earlier than the November 2005 stair incident. Davis reported to the trial court a consistency in the pain before and after her November fall even though the fall in Dr. Brown’s opinion may have aggravated her symptoms. The trial court’s measure of Davis’s credibility could concern its belief in the description of her continuing pain before and after the 11sNovember fall regardless of whether Davis may have abused pain medication
 
 *988
 
 for that pain.
 
 [6]
 

 The manifest error standard does not turn on whether the defendants have presented one reasonable view of the evidence, but whether the trier-of-fact properly determined its judgment on another reasonable view, weighing differently the facts as a whole and making credibility determinations. We find that any issue of causation of Davis’s condition and pain was addressed in the opinions of Drs. Brown and Forte, and the trial court’s determination that the April of 2005 accident was the cause of Davis’s damages is not clearly wrong.
 
 [7]
 

 II.
 

 Past Special Damages Lost Wages and Household Services
 

 Defendants assign as error the trial court’s award for lost wages and lost household services occurring before trial. They assert that Davis presented no medical testimony that she was disabled from any occupation or from performing household duties. They cite Davis’s work history and claim that her non-teaching position in school administration at the time of trial was of her own choosing.
 

 To recover for actual wage loss, a plaintiff must prove that she would have been earning wages but for the accident in question.
 
 Boyette v. Unite
 
 d
 
 Services Auto. Ass’n,
 
 00-1918 (La.4/3/01), 783 So.2d 1276;
 
 Hunt v. Board of Sup’rs of Louisiana State Univ. and Agric. and Mechanical College,
 
 522 So.2d 1144, 1152 (La.App. 2d Cir.1988). In other words, it is the plaintiffs burden to prove past lost earnings and the length of time missed from work due to the accident.
 
 Boyette, supra.
 

 Awards for past lost wages are not susceptible to the great discretion given the factfinder, because lost income is subject to mathematical calculation.
 
 Bassett v. Toys “R” Us Delaware, Inc.,
 
 36,434 (La.App.2d Cir.12/30/02), 836 So.2d 465,
 
 writ denied,
 
 03-0560 (La.4/25/03), 842 So.2d 408;
 
 Worsham v. Hetrick,
 
 34,206 (La.App.2d Cir.2/7/01), 777 So.2d 1280;
 
 Robbins v. State Dept. of Labor,
 
 31,590 (La.App.2d Cir.2/24/99), 728 So.2d 991. Past lost income can be computed on an amount the plaintiff would in all probability have been earning at the time of trial and damages for loss of past income are not necessarily limited to a multiplier of the amount earned at the time of injury.
 
 Bassett, supra; Robbins, supra.
 

 The jurisprudence has allowed as an element of damages, reasonable housekeeping expenses necessitated by the incapacity of an injured person.
 
 Odom v. Claiborne Elec. Co-op., Inc.,
 
 623 So.2d 217 (La.App. 2d Cir.1993),
 
 writ denied,
 
 629 So.2d 1171 (La.1993);
 
 Mims v. Reliance Ins. Co.,
 
 535 So.2d 1085 (La.App. 2d Cir.1988);
 
 Cushman v. Fireman’s Fund Ins. Co.,
 
 401 So.2d 477 (La.App. 2d Cir.1981). These awards have been rejected in cases where the plaintiff employed a housekeeper prior to the accident or injury, and the evidence failed to show that plaintiff would be | unable to perform substantially all of the usual household duties.
 
 Levy v. Bayou Indus. Maintenance Services, Inc.,
 
 03-
 
 *989
 
 0037 (La. App 1st Cir. 9/26/03), 855 So.2d 968,
 
 writs denied,
 
 03-3161 (La.2/6/04), 865 So.2d 724, 03-3200 (La.2/6/04), 865 So.2d 727.
 

 Proof of lost wages included the testimony of Davis who asserted that she could not return to teaching first grade because of its physical demands and her pain. She also discussed her inability to perform high intensity cardio or lifting, although she is able to walk. Davis submitted her employment records from the Ouachita Parish School board which documented the time she was off of work. The sole expert testimony regarding the issue of Davis’s ability to work was that of Dr. Brown. He explained that the 10% impairment of the body rating he gave Davis in May of 2006 was an anatomic impairment, not a functional impairment. At the time of the rating, he stated there was nothing that would have prevented Davis from teaching. Additionally, the evidence regarding Davis’s lost earnings included the expert report and testimony of economist Dr. Melvin Harju, the documentation supporting his conclusions and Davis’s tax returns.
 

 We find that this evidence is sufficient proof of Davis’s entitlement to past lost wages. As discussed above, Davis’s testimony proved that she consistently experienced pain after the April 2005 accident which caused her to miss work and ultimately accept an administrative position. The documentation of her work history corroborates this testimony. Thus, Davis established that she would have been earning the lost wages but for the accident in question. As noted above, Dr. Harju obtained his salary figures l1Rfrom documentation provided by the Ouachita Parish School Board including salary and supplemental check information. His total past earnings calculation from January 31, 2006 until May 20, 2009, was $131,093. Because these calculations were provided by Davis’s employer, they are sufficient proof of salary information. However, for the years 2006-2007, Dr. Harju failed to deduct certain income earned by Davis as shown on her tax returns for those years as he erroneously concluded that Davis stopped working completely on January 31, 2006. The evidence, including Davis’s tax returns and W-2s, shows that she in fact earned more income than Dr. Harju documented in both 2006
 
 [8]
 
 and 2007. Thus, Dr. Harju’s calculations for 2006 and 2007 are in error. Accordingly, Davis’s lost earnings calculation from the date of the accident until trial will be reduced by the sum of $17,858 ($9,932 in 2006 and $7,926 in 2007).
 

 The documentation supporting Dr. Harju’s fringe benefit calculations, moreover, was unsupported by any testimony of officials from the Ouachita Parish School Board. Additionally, there are clear inaccuracies in the data, e.g., the inclusion of social security benefits for the state employee. Without proof from the subject school board regarding any actual fringe benefits paid by the board to its employees, the evidence is insufficient to establish Davis’s entitlement to these additional sums. On this basis we exclude any fringe benefit calculation.
 

 After deducting these sums from the lost earnings calculation, the past lost earnings award is adjusted to the sum of $113,235.
 

 119Regarding past household services, the only evidence presented by the
 
 *990
 
 plaintiff included Davis’s testimony and Dr. Harju’s report. Davis testified that she had great difficulty with housework because it aggravates her neck. She estimated that after the accident, she would spend 6-7 hours per week longer on housework than before. Nevertheless, she testified that since she has received the rhizotomy procedures with Dr. Forte, she has been able to “resume normal activities.” Further in a verified economic loss, household services statement submitted to her economist on May 22, 2008, and admitted into evidence, Davis made the following statement:
 

 All of my home care tasks such as cleaning, laundry, and cooking were done by my family as I was unable to complete simple household chores. Since having the procedures, I am currently able to complete these duties.
 

 Dr. Harju calculated the replacement cost per hour for a maid or housekeeping services in Monroe at $6.68 per hour. He concluded that the replacement cost of one hour of work per week from April 11, 2005 until May 20, 2009, would be $1,586, and the trial court award of $9,984 represents 6.5 hours per week. Nevertheless, the above-referenced verified document submitted to Dr. Harju, Davis indicated that by May 22, 2008, she was able to complete these household tasks without any indicated restriction. Thus, Davis’s need for these household services was only supported by the evidence prior to May of 2008, and we reduce the past household services award to $7,548.
 

 Jam.
 

 Future Medical Expenses
 

 In this assignment of error, defendants argue that the trial court erred in awarding future medical expenses of $1,146,321. This represents the cost of office visits, trigger point injections, rhizo-tomy treatment, and medication for the remainder of Davis’s life (54.1 year life expectancy), with the rhizotomy procedures, in particular, being administered twice each year. Defendants argue the lack of proof of causation and the lack of medical opinion that “such lifetime treatment would be either effective or necessary.”
 

 The cost of future medical treatment and expenses cannot be precisely measured; however, the plaintiff must still establish future medical expenses with some degree of certainty through medical testimony that such expenses are indicated and their probable cost.
 
 Locke v. Young,
 
 42,703 (La.App.2d Cir.12/12/07), 973 So.2d 831;
 
 Sepulvado v. Turner,
 
 37,912 (La.App.2d Cir. 12/10/03), 862 So.2d 457,
 
 writ denied,
 
 04-0089 (La.3/19/04), 869 So.2d 855;
 
 Lewis v. State Farm Ins. Co.,
 
 41,527 (La.App.2d Cir.12/27/06), 946 So.2d 708.
 

 A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part.
 
 Green v. K-Mart Corp.,
 
 03-2495 (La.5/25/04), 874 So.2d 838. The trier of fact may substitute common sense and judgment for that of an expert witness when such a substitution appears warranted on the record as a whole.
 
 Id.
 

 Evidence relating to the rhizotomy procedure’s effectiveness and cost included Dr. Forte’s testimony and the cost estimate and projected economic 1measure of Dr. Melvin Harju. The rhizotomy procedure alone costs $10,000. Dr. Harju’s calculation was based on the cost of two rhizotomies per year and the additional procedures for a total of $25,409.12 per year for the rest of Davis’s life.
 
 [9]
 
 Never
 
 *991
 
 theless, because Dr. Harju based his calculations upon the documentation provided to him by Dr. Forte, it is the physician’s testimony which is crucial to the determination of the issue at hand.
 

 In this case, the evidence shows that Davis had undergone four rhizotomy procedures as of the time of trial and had received relief from that series of treatments. Dr. Forte testified that it was not uncommon for the patient to require more than one rhizotomy procedure and that in his opinion Davis would require the rhizo-tomy procedure “at least every two years with trigger point injections in between.” Dr. Forte related the need for repeated procedures to the failure to burn the nerve completely. Yet, he never testified that a complete nerve burn was not possible. Most significantly, he never explained whether the procedure could be repeated on the same nerves for Davis’s lifetime without alteration or harm to nerves which would terminate the availability or effectiveness of the treatment. With Davis’s life expectancy of 54 years, the largest portion of the $1,146,321 award for future medicals assumes that Davis will undergo 108 rhizotomy procedures through age 81. We find this projection of future medical expenses not supported by medical testimony. That testimony does not establish with a sufficient degree of certainty the probability for the expenses for 54 years.
 

 122Pue to this lack of proof to indicate the expected duration of the procedures, the future medical damage award must be amended. Based upon the evidence before us, we conclude that a 30-year duration, reflecting the remainder of Davis’s expected work life, with procedures performed every other year (15 procedures), would be an appropriate frequency and term for Davis’s future treatment. We amend the judgment to reduce Davis’s future medical expense award to $229,505.
 
 [10]
 

 IV.
 

 Future Wages and Household Services
 

 The defendants next argue that the trial court erred in awarding lost future wages and household services due to the complete lack of expert evidence that Davis was disabled from any occupation or from performing household duties. Defendants further contend that Davis’s occupational decisions were “based upon choice, not disability.”
 

 A plaintiff bears the burden of proving his claim for lost earnings. For purposes of determining this type of damages, the amount of lost earnings need not be proved with mathematical certainty, but by such proof as reasonably establishes the claim.
 
 Locke, supra.
 
 Since awards for future lost income are inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty, the courts must exercise sound judicial discretion to determine these awards.
 
 Id.
 
 The awards should be consistent with the record and not work a hardship upon either party.
 
 Locke, supra; Robbins, supra.
 
 Purely conjectural or uncertain future lost earnings lawill not be allowed.
 
 Doss v. Second Chance Body Armor, Inc.,
 
 34,788 (La.App.2d Cir.8/22/01), 794 So.2d 97.
 

 To ascertain whether a personal injury plaintiff should recover for lost earning capacity, the trial court should
 
 *992
 
 consider whether and how much the plaintiffs current condition disadvantages her in the work force. Among the factors to be considered are her physical condition before and after her injury, her age and life expectancy, work life expectancy, discount and inflation rates and past work record.
 
 Doss, supra.
 
 Lost income awards are speculative and cannot be calculated with absolute certainty. Therefore, the trial court is given broad discretion in setting an award for lost earning capacity. However, there must be a factual basis in the record.
 
 Gorton v. Ouachita Parish Police Jury,
 
 35,432 (La.App.2d Cir.4/3/02), 814 So.2d 95,
 
 writs denied,
 
 02-1273 (La.8/30/02), 823 So.2d 950, 02-1261 (La.8/30/02), 823 So.2d 952.
 

 The testimony of an economist is entitled to great weight, but since it is necessarily based on uncertain future events, it is not conclusive.
 
 Doss, supra; Cutchall v. Great American Pump Co.,
 
 460 So.2d 1106 (La.App. 2d Cir.1984).
 

 In computing loss of future income, it is first necessary to determine whether and for how long a plaintiffs disability will prevent her from engaging in work of the same or similar kind that she was doing at the time of his injury; it is necessary to ascertain whether she has been disabled from work for which she is fitted by training and experience.
 
 Hunt, supra; Morgan v. Willis-Knighton Medical Center,
 
 456 So.2d 650 (La.App. 2d Cir.1984).
 

 L S4In order to obtain an award for impaired earning capacity or future loss of wages, a plaintiff must present medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident.
 
 Bize v. Boyer,
 
 408 So.2d 1309 (La.1982);
 
 Aisole v. Dean,
 
 574 So.2d 1248 (La.1991);
 
 Thompson v. Coates,
 
 29,333 (La.App.2d Cir.5/7/97), 694 So.2d 599,
 
 writs denied,
 
 97-1442 (La.9/26/97), 701 So.2d 985, 97-1521 (La.9/26/97), 701 So.2d 987. Lay testimony simply serves to complement and corroborate the medical evidence.
 
 Bize, supra.
 

 For Davis’s future lost wages, the trial court awarded her the sum of $734,795, which according to Dr. Harju’s calculations represented the amount of projected future income lost by Davis as a teacher in her expected worklife of 30.8 years with offset earnings of $25,000 per year. Defendants urge error in this award based upon the “complete absence in the record of any expert testimony that plaintiff was disabled from any occupation.” We agree with defendants.
 

 The sole evidence relating to Davis’s inability to continue teaching first grade was that of Davis. In sum, Davis testified that while she can perform administrative duties in the school where she works, teaching in the future was “far too much that I can foresee right now to undertake.” She explained that given the opportunity to substitute teach, “it’s been so physically demanding just for the one day that it’s hard to imagine a whole year of bending and pulling and doing all those things.” Unfortunately, however, Davis presented no medical testimony establishing that she is disabled as the result of her injuries. As noted above, Dr. Brown gave her no functional | ^impairment and concluded in May of 2006 that there was nothing that would have prevented Davis from teaching. This was before the time that Davis began receiving the rhizotomy and other procedures which significantly improved her condition. No physician offered any further testimony on the issue. Thus, with no medical evidence establishing her disability with reasonable certainty, Davis cannot recover future lost wages. We amend the
 
 *993
 
 judgment to delete the future lost wage award.
 

 As discussed above, the jurisprudence has allowed as an element of damages, reasonable housekeeping expenses necessitated by the incapacity of an injured person.
 
 Odom, supra; Mims, supra; Cushman, supra.
 
 These awards have been rejected in cases where the plaintiff employed a housekeeper prior to the accident or injury, and the evidence failed to show that plaintiff would be unable to perform substantially all of the usual household duties.
 
 Levy, supra.
 

 The judgment in this case awarded Davis $84,766 in future household services for the remainder of Davis’s life based upon Dr. Harju’s calculations and Davis’s testimony that it took her an extra 6.5 hours per week to complete her household chores. Davis did not testify that she was unable to do any housework. In fact, as discussed above, Davis admitted her ability to complete these chores after the rhizoto-my procedures, although at a slower pace.
 

 A review of the jurisprudence from 1962,
 
 [11]
 
 first discussing the award of reasonable and necessary expenditures for past and future household services, 12(jShows that these awards have historically been limited to repayment for domestic help which was secured to perform domestic chores because of total incapacity of the injured party.
 
 Davis v. Powell,
 
 141 So.2d 679 (La.App. 1st Cir.1962);
 
 Hickman v. Bawcom,
 
 149 So.2d 178 (La.App. 3d Cir.1963);
 
 Vonderbruegge v. Bethea,
 
 250 So.2d 407 (La.App. 1st Cir.1971);
 
 Edwards v. Lewis Grocery Co.,
 
 391 So.2d 13 (La.App. 2d Cir.1980);
 
 Cushman v. Fireman’s Fund Ins. Co., supra; Prevost v. Cowan,
 
 431 So.2d 1063 (La.App. 1st Cir.1983);
 
 Deville v. K-Mart Corp.,
 
 498 So.2d 1122 (La.App. 3d Cir.1986);
 
 Mims, supra; Odom, supra.
 
 Only in one case did the court award future damages for maid services even though the family did not hire a maid when the plaintiff was unable to perform any household chores.
 
 Varnell v. Louisiana Tech Univ.,
 
 30,260 (La.App.2d Cir.2/25/98), 709 So.2d 890,
 
 writ granted,
 
 98-0785 (La.6/5/98), 720 So.2d 1203,
 
 writ denied,
 
 98-0776 (La.6/5/98), 720 So.2d 680.
 
 [12]
 
 Thus, the cases awarding past and future lost household services limited recovery to situations where substitute housekeepers were actually utilized or would be necessary because of the plaintiffs total incapacity to perform housekeeping services.
 

 In addition to the lack of legal authority for such an award, no medical testimony established that Davis was physically incapable of performing such duties. In fact, there is no evidence on the record that Drs. Brown and Forte assigned any permanent disability to Davis. As discussed above, Davis conceded that she was able to complete her housework. The record also lacks Reproof that Davis utilized maid services or that the services were or would be necessary for the remainder of her life. Thus, Davis did not prove the need for the services or the extent and duration they would be required.
 
 Mims, supra.
 
 On these grounds, we reverse the award of future lost household services. Ultimately, Davis’s receipt of $100,000 in
 
 *994
 
 general damages for loss of enjoyment of life serves to compensate her for any alterations to her lifestyle and activities which can be attributed to her neck injuries.
 
 [13]
 

 Conclusion
 

 For the foregoing reasons, the judgment of the trial court is affirmed as to the causation determination, amended to reduce the past lost wage award from $157,370 to $113,235, past household services from $9,984 to $7,548, and the future medical awards from $1,146,321 to $229,515 and reversed as to the award of future lost wages and future household services for a total judgment of $871,301.99. Costs of appeal are assessed equally to the parties.
 

 JUDGMENT AFFIRMED IN PART, REVERSED IN PART AND AMENDED IN PART.
 

 [1]
 

 . In fact, Dr. Hebert discontinued Davis as a patient by October of 2005.
 

 [2]
 

 . A rhizotomy is the cauterization of the nerves near the facet joints. The physician places a needle near the nerve which is stimulated with an electrical current. The physician then "bums” the nerve. Records from Dr. Forte's office indicated the cost of one rhizotomy procedure in June of 2008 was $10,400.
 

 [3]
 

 .A trigger point injection is the injection of anesthesia directly into the muscle; the cost of a yearly trigger point injection in June of 2008 was $350.
 

 [4]
 

 . Davis was seen by her primary care physician, Dr. David Hebert, who diagnosed her with mild whiplash which resolved itself.
 

 [5]
 

 . Records from the Ouachita Parish School Board show that at the recommendation of Drs. Hamilton and Brown, Davis took extend- . ed sick leave from February 15-March 17, 2006, for cervical disc problems.
 

 [6]
 

 . In reasons for judgment, the trial court determined that the "defendants unsuccessfully attempted to paint a picture of a doctor shopping pain pill addict” because "these assertions” are “unsupported by the evidence presented at trial.”
 

 [7]
 

 . Notably, defendants have presented no assignment of error or argument regarding the excessiveness of the general damage award or the award for loss of enjoyment of life in the event of an affirmance of the causation determination. Thus, this portion of the judgment is not before us on appeal.
 

 [8]
 

 . For 2006, Dr. Harju credited Davis with income of $14,654 when her tax return showed that she earned $24,586.
 

 [9]
 

 . Dr. Harju's report labeled his alternative calculations as "Alternating” and "Each and
 
 *991
 
 Every Year,” when in fact the numbers reflect annual and semi-annual procedures.
 

 [10]
 

 . Included in this amount are four yearly office visits for 30 years, trigger point injections in alternating years, the rhizotomy procedure in alternating years and yearly prescription drugs.
 

 [11]
 

 . The cases are cited in chronological order for purposes of this discussion.
 

 [12]
 

 . We acknowledge that a divided panel of this court participated in the final rendition of
 
 Maranto v. Goodyear Tire & Rubber Co.,
 
 25,114 (La.App.2d Cir.5/10/95), 661 So.2d 503, which awarded $25,000 in past and future loss of household services for a plaintiff who could perform some household duties. In support of the award, however,
 
 Maranto
 
 relied on the above-cited jurisprudence which, as noted, provides no authority for future household services.
 

 [13]
 

 . Loss of enjoyment of life, sometimes known as hedonic damages, refers to the detrimental alternations of a person’s life or lifestyle or a person's inability to participate in the activities or pleasures of life that were formerly enjoyed.
 
 McGee v. A C and S, Inc.,
 
 05-1036 (La.7/10/06), 933 So.2d 770.