962 So.2d 470 (2007)
Kory STEEN and Bonnie Steen, Husband and Wife, Individually and on Behalf of their Minor Son, Patrick Steen
v.
PROFESSIONAL LIABILITY INSURANCE COMPANY OF AMERICA, et al.
No. 2006-CA-1230.
Court of Appeal of Louisiana, Fourth Circuit.
June 27, 2007.
*472 Tracey Rannals Bryan, Gainsburgh, Benjamin, David, Meunier & Warshauer, L.L.C., New Orleans, LA, James M. Williams, Gauthier, Houghtaling, Williams & Sulzer, L.L.P., Metairie, LA, for Plaintiffs/Appellees.
Corinne A. Morrison, Douglas L. Grundmeyer, James C. Young, Loretta O. Hoskins, Chaffe McCall, L.L.P., New Orleans, *473 LA, for the Louisiana Patient's Compensation Fund and the Louisiana Patient's Compensation Fund Oversight Board.
(Court composed of Judge TERRI F. LOVE, Judge DAVID S. GORBATY, Judge EDWIN A. LOMBARD).
EDWIN A. LOMBARD, Judge.
Defendant Dr. Thomas B. Ryan, an obstetrician, and his medical malpractice insurer, Professional Liability Insurance Company of America, appeal the judgment entered in favor of plaintiffs Kory and Bonnie Steen, individually and on behalf of their minor child, Patrick Steen, for damages arising from Patrick's birth. In addition, the Louisiana Patient's Compensation Fund ("PCF") and the Louisiana Patient's Compensation Fund Oversight Board ("PCFOB"), exercising their statutory rights under La.Rev.Stat. 40:1299.41, et seq., the Louisiana Medical Malpractice Act ("MMA"), seek review of any damages greater than $100,000.00 payable by the Fund.
After review of the record in light of the arguments of the parties and applicable law, we affirm in part and reverse in part.
Relevant Facts
Mrs. Steen was admitted on June 9, 1996, to the Labor and Delivery Unit of Memorial Medical CenterBaptist Campus for delivery of her baby. Although Mrs. Steen's previous delivery was by the surgical procedural commonly referred to as a C-Section, Dr. Ryan proceeded with a vaginal delivery. Upon being fully dilated, Mrs. Steen was instructed to push. Labor progressed normally until Dr. Ryan delivered the baby's head with low forceps and the baby displayed what is referred to as a "turtle sign," i.e., the baby's head is sucked back toward the mother's perineum or vulva and does not restitute on its own. Dr. Ryan continued to apply moderate traction on the baby's head for approximately thirty seconds in an attempt to dislodge the baby's shoulders. After traction failed to release the baby's shoulders, Dr. Ryan performed a Zavenelli maneuver to reinsert the baby's head into the vagina and then delivered the baby by C-section. Patrick Steen sustained a brachial plexus injury during birth and has been diagnosed with Erbs Palsy.
The matter was submitted to a Medical Review Panel on June 5, 1997. Several years later, on February 17, 2000, the Medical Review Panel issued its finding that there was a material issue of fact bearing on liability pertaining to the initial decision to attempt a vaginal birth in this case, but that once the shoulder dystocia occurred, the defendant acted in a timely and expeditious fashion.
On May 3, 2000, the Steens timely filed this medical malpractice lawsuit, individually and on behalf of their child, seeking damages from Tenet Healthsystems of Louisiana, Inc. and Tenet Healthsystems of Louisiana Memorial Medical Center  Baptist Campus ("Tenet"), Physician Network Corporation of Louisiana ("Physician Network"), Professional Liability Insurance Company of America, and Dr. Ryan. The defendants answered, averring that the alleged injuries did not result from the medical care and treatment that they provided and were not caused by a failure on the part of Dr. Ryan to meet the standard of care. Prior to trial the plaintiffs dismissed Physician Network and the district court dismissed Tenet. After a four-day bench trial in February 2006, the district court took the matter under advisement. On April 12, 2006, the district court signed a judgment finding Dr. Ryan at fault for the brachial plexus injury sustained during delivery, awarding Patrick Steen a total of $500,000.00 in general damages plus interests and costs, and $513, 328.10 in special *474 damages for past and future medical expenses, and awarding each of his parents $50,000.00 for their loss of consortium.
Standard of Review
Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, in order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirely and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart, supra at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Id. (citation omitted). Accordingly, even where an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell, supra at 844. "The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Stobart, supra at 883 (quoting Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, when two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id. Likewise, unless documents or objective evidence clearly contradict the fact finder's credibility determination, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell, supra at 844-45.
Applicable Law
In a medical malpractice action, the plaintiff has the burden of proving: (1) the degree of knowledge or skill possessed or degree of care ordinarily exercised by physicians within that medical specialty, i.e., the standard of care; (2) that defendant either lacked such degree of knowledge or skill, or failed to use reasonable care and diligence along with his best judgment in application of that skill, i.e. a breach of the standard of care; and (3) that as result, injuries were sustained that would not have otherwise occurred, i.e., causation. La.Rev.Stat. 9:2794; Williams v. Memorial Medical Center, 03-1806 (La.App. 4 Cir. 3/17/04), 870 So.2d 1044 (in a medical malpractice case, the physician is found to be negligent when the physician violates the applicable standard of care, and that violation results in the plaintiff's injury).
Discussion
On appeal, the defendants do not dispute causation but argue that the plaintiffs failed to establish that Dr. Ryan breached the applicable standard of care and that record does not support the damages awarded in this case.
Standard of Care
First, the defendants argue that the trial court's determination of the applicable standard of care is not supported by the record and is therefore manifestly erroneous. Specifically, the defendants allege that the trial court erred in finding that "all physicians agreed that the standard of care is to cease all traction upon encountering shoulder dystocia" because some of the defendants' experts testified that traction may be used to confirm the *475 diagnosis of shoulder dystocia and as an initial attempt to dislodge the shoulder.
At trial, the plaintiffs presented expert testimony to establish the standard of care in this case and, in response, the defendants presented the testimony of their own expert witnesses as to the standard of care. As evidenced in her reasons for judgment, the trial judge considered the testimony of all the expert witnesses in determining the applicable standard of care, stating as follows:
This Court must first determine the applicable standard of care in this care [sic] in this case. Both parties presented expert testimony on the issue of the applicable standard of care. While the expert opinion as to whether Dr. Ryan breached the applicable standard of care varied widely, most agreed the applicable standard of care in such case as this one is that once a physician is encountered with a shoulder dystocia any and all traction, mild, moderate or otherwise, should cease and certain maneuvers should be performed in an attempt to dislodge the shoulder.
FN. There are two significant points of disagreement between the experts as to the applicable standard of care. First, plaintiff experts asserted that once a shoulder dystocia is even suspected, it would be a breach of the standard of care to apply any traction. Defendants' experts, however, stated that traction could still be used to confirm a shoulder dystocia, but once the shoulder dystocia is confirmed all traction, unless accompanied with a maneuver should cease. Second, there is a disagreement between the experts as to what maneuvers should be attempted and in what order they should be attempted.

As all physicians agreed that the above is the applicable standard of care, this Court is comfortable in holding the same as the law of the case.
(emphasis added).
On appeal, the defendants argue that the trial court was clearly wrong in adopting the plaintiff expert's version of the applicable standard of care (all traction must cease as soon as a shoulder dystocia is encountered) because "the record unequivocally establishes that all the experts did not agree that upon encountering shoulder all traction must cease."
The defendants misapprehend the trial court's judgment, however. While the reasons for judgment initially appear inconsistent, when read in its full context (including the footnote), it is clear that the trial court was not adopting the standard of care posited by the plaintiff expert witnesses, i.e., that all traction must stop upon encountering shoulder dystocia, but rather adopted the standard to which all of the expert witnesses agreed, i.e, once shoulder dystocia was confirmed, all traction unless accompanied with a maneuver should cease. To find otherwise, as the defendant's suggest we should, necessitates an inherently contradictory interpretation of the trial judge's reasoning.
Moreover, our review of the record indicates that (as the trial court noted in her footnote) the expert witnesses disagreed as to which specific maneuvers are appropriate in conjunction with continued traction after encountering shoulder dystocia but generally agreed that continued traction after encountering shoulder dystocia is only appropriate when performed in conjunction with a diagnostic or corrective maneuver and, concomitantly, that the continuation of traction alone, without the requisite diagnostic or corrective maneuver, is inappropriate. Accordingly, we cannot find that the trial court was manifestly erroneous in adopting as the applicable standard of care the standard agreed to by *476 all the experts, i.e., that it was below the standard of care for a physician to continue to assert traction alone (without a diagnostic or corrective action) once he encountered shoulder dystocia.
Whether Dr. Ryan Breached the Standard of Care
Next, the defendants contend that because the trial court's determination of the standard of care was clearly wrong, the subsequent finding that Dr. Ryan breached the standard of care is also clearly wrong. The defendants also contend that it was error for the trial court to find that Dr. Ryan breached the standard of care based upon a statement in his deposition testimony.
First, as discussed above, the trial court was not clearly wrong in its determination of the applicable standard of care and, thus, there is no merit to the defendants' contention that the trial court erred in determining that Dr. Ryan breached the standard of care on that basis.
Likewise, the defendant's alternative argument that the trial court erred in finding that Dr. Ryan breached the standard of care based on a statement in his deposition testimony rather than accepting his trial testimony and the medical evidence submitted at trial is also without merit. A review of the record indicates that Dr. Ryan's defense at trial was that he continued the traction 20-30 seconds after encountering the turtle sign only to confirm a shoulder dystocia and, as such, his action in applying mild to moderate traction for diagnostic purposes did not constitute a breach of the standard of care. In her reasons for judgment, the trial judge made the following finding:
The Court does not agree with the defendants' recitation of the facts. Dr. Ryan did consistently testify at trial that he only applied traction to confirm his suspicions of shoulder dystocia. However, an excerpt from his deposition testimony is replicated below:
Q. Why didn't you do it?
A. After I delivered the baby's head, it was evident to me that this was a significant shoulder dystocia from the tightness of the baby's head against the mother's tissues. I gave the baby a moderate tug to see if the anterior should would slip past . . . "
When confronted with this testimony at trial, Dr. Ryan stated that he simply misspoke during his deposition. He did admit, however, that upon the delivery of the head the baby exhibited the "turtle sign", which is synonymous with a shoulder dystocia. He further admitted that after the delivery of the head he applied 20 to 30 seconds of mild to moderate traction on the baby's head and neck.
Based upon these admissions, taking in conjunction with the deposition testimony, the court holds that Dr. Ryan did in fact breach the applicable standard of care. Dr. Ryan continued to apply mild to moderate traction to the head and neck of Patrick Steen even after he knew that he was dealing with a "significant" shoulder dystocia.
It is clear from the reasons for judgment, that the trial court made a credibility determination that Dr. Ryan's deposition testimony, rather than his later trial testimony, accurately reflected the facts. Although Dr. Ryan subsequently changed his testimony to adhere to the standard of care, there is no dispute that Dr. Ryan's initial statement of events in his deposition clearly indicates that he continued traction without any sort of corrective maneuver even after he knew (or diagnosed) the shoulder dystocia. Accordingly, we do not find that the trial court was clearly wrong *477 in finding, based upon Dr. Ryan's initial statement that he continued traction without any diagnostic or corrective maneuver after encountering shoulder dystocia, that Dr. Ryan breached the standard of care.
Damages
Dr. Ryan and his insurer raise only one assignment of error pertaining to the damage award, arguing that the trial court erred in awarding consortium damages exceeding the statutory medical malpractice cap of $500,000.00. The PCF and PCFOB raise four assignments of error pertaining the damages award: (1) the district court manifestly erred in concluding that the plaintiffs carried their burden of proving that the defendant caused damages in excess of $100,000.00; (2) the district court erred in awarding $400,477.00 for Patrick Steen's future medical expenses when the Louisiana Medical Malpractice Act mandates that expenses for medical care not yet incurred at the time of trial may not be reduced to a money judgment; (3) the district court erred in awarding $10,412.20, in past medical expenses for the birth of Patrick Steen, when plaintiffs failed to prove that those medical expenses are related to the treatment of Patrick Steen's injuries; and (4) the district court manifestly erred in concluding that the plaintiff's carried their burden of proving that the defendant caused the loss of consortium damages in the amount of $50,000.00.
Consortium damages
The plaintiffs concede that the loss of consortium awards made to Mr. and Mrs. Steen are derivative of the general damages and are extinguished due to the fact that Patrick Steen's claims exceed the medical malpractice cap and agree that the consortium damage awards should be vacated.
General Damages
Finding that the plaintiffs proved that Dr. Ryan's malpractice caused permanent and life-long injuries with damages exceeding the statutory cap of $500,000.00, the trial court awarded $500,000.00, plus interests and court costs, for general damages. The defendants assert, however, that because the child retains 50-55% use of his hand and arm, the damages arising from Dr. Ryan's malpractice warrant no more that an award of $160,000.00. According to the defendants, an award of $500,000.00 is warranted only when a child sustains a complete loss of use of his arm.
The discretion vested in the trial court is vast and, accordingly, an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). Because "[r]easonable persons frequently disagree about the measure of general damages in a particular case" . . . "only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Id. (emphasis added). In this case, the defendants assert that this court should reduce the award because the child suffers only a lifelong permanent 45-50% hand and arm disability. We do not agree. The trial court did not abuse its vast discretion in awarding $500,000.00, the maximum amount available, in general damages.
Future Medical Expenses
The trial court awarded $513,328.10 for special damages based on its finding that the plaintiffs submitted uncontroverted past medical expenses of $111,285.10 and future medical expenses of $641,046.00 (reduced to present day value of $400,477.00). The defendants argue, however, that the trial court is prohibited *478 from awarding a lump sum for future medical expenses because, under La.Rev.Stat. 40:1299.43 and Kelty v. Brumfield, 93-1142 (La.2/25/94), 633 So.2d 1210, 1217-19, the PCF has exclusive jurisdiction over all claims for future medical care and related benefits.
The defendants, however, misinterpret the statute and relevant jurisprudence. Pursuant to La.Rev.Stat. 40:1299.44(D)(1)(a) and (2)(a), the PCFOB is a legislative creation vested with the responsibility and full authority under law for the "management, administration, operation and defense" of the PCF. The PCFOB's role with regard to payments for future medical care and related benefits required as a result of a medical malpractice settlement or judgment is explained in La.Rev.Stat. 40:1299.43(C) as follows:
C. Once a judgment is entered in favor of a patient who is found to be in need of future medical care and related benefits that will be incurred after the date of the response to the special interrogatory by the jury or the court's finding or a settlement is reached between a patient and the patient's compensation fund in which the provision of medical care and related benefits that will be incurred after the date of settlement is agreed upon and continuing as long as medical or surgical attention is reasonably necessary, the patient may make a claim to the patient's compensation fund through the board for all future medical care and related benefits directly or indirectly made necessary by the health care provider's malpractice unless the patient refuses to allow them to be furnished.
The statute further provides, "The district court from which final judgment issues shall have continuing jurisdiction in cases where medical care and related benefits are determined to be needed by the patient." La.Rev.Stat. 40:1299.43(E)(1). In Kelty, the Louisiana Supreme Court interpreted La.Rev.Stat. 40:1299.43(C) as granting the PCFOB "exclusive jurisdiction for future medical care and related care claims" and, accordingly, the PCFOB's jurisdiction over future medical care and related claims includes the authority to receive and evaluate, as well as to pay, settle, or reject claims and to "supervise the administration of continuing claims." Kelty, 633 So.2d at 1218-1219; see also Bijou v. Alton Ochsner Foundation, 95-3074 (La.09/05/1996), 679 So.2d 893, 898 (plaintiff who received a favorable trial court judgment finding him in need of future medical care and related benefits was directed to make claim to the PCFOB for further action and recovery of his future medical care claim). However, Section C and Kelty must be read in the context of La.Rev.Stat. 40:1299.43(A)(2) which provides in pertinent part that "In actions upon malpractice claims tried by the court, the court's finding shall include a recitation that the patient is or is not in need of future medical care and related benefits that will be incurred after the date of the response to the special interrogatory and the amount thereof (emphasis added)." Thus, Section A requires the trial court to determine whether a plaintiff is in need of future medical care and, if so, to specify "the amount thereof", thereby mandating that the trial court render a judgment for future medical expenses prior to the plaintiff submitting a claim for payment to the PCF. Watkins v. Lake Charles Memorial Hospital, 04-355, pp. 4-5 (La.App. 3 Cir. 12/15/04), 896 So.2d 130, 134-135, writ den., 05-0145 (La.4/8/05), 898 So.2d 1279. Accordingly, a lump sum award for future medical expenses is properly contained in the judgment even though it is not made executory until review and approval by the LPCF or, if denied, upon subsequent order of the *479 court under its continuing jurisdiction. See La.Rev.Stat. 40:1299.43(E)(1) ("The district court from which final judgment issues shall have continuing jurisdiction in cases where medical care and related benefits are determined to be needed by the patient.").
Past Medical Expenses
With regard to the previously incurred medical costs, the PCF argues that the plaintiffs did not sustain their burden in proving these expenses. The trial court found, however, that the plaintiff's claim for medical benefits already received was unrefuted.
The definition of "future medical care and related benefits" is contained in La. Rev.Stat. 40:1299.43(B)(1), which provides broadly, that:
"Future medical care and related benefits" for the purpose of this Section means all of the following reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, after the date of injury.

(Emphasis added.) Although this provision does not distinguish between medical expenses incurred from the date of injury to judgment or settlement and those expenses not yet incurred but which may be necessary after the date of judgment, some courts have routinely included already incurred medical expenses in the judgment and made that portion of the judgment executory. See Hall v. Brookshire, Ltd., 02-2404, p. 28 (La.6/27/03), 848 So.2d 559, 576 (holding interest was owed on "future" medical expenses which had already been incurred);); Maxwell v. Soileau, 561 So.2d 1378 (La.1990) (including already incurred medical expenses in a money judgment awarded to plaintiff on appeal); see also LeRay v. Bartholomew, 03-1370 (La.App. 5 Cir. 3/30/04), 871 So.2d 492 (noting that trial court correctly made distinction between medical expenses and related benefits incurred between the accident and the date of trial and future medical expenses which will occur after trial and, in so doing, correctly reduced the past medical expenses to a money judgment). With regard to the portion of the special damage award based on past medical expenses, a 2004 amendment to La.Rev.Stat. 40:1299.43(A)(4), clarifies that future medical expenses already incurred at the time of judgment shall be included in the money judgment and made executory. The amendment provides: "The remaining portion of the judgment, including the amount of future medical care and related benefits incurred up to the date of the response to the special interrogatory by the jury or the court's finding shall be paid in accordance with R.S. 40:1299.44(A)(7) and R.S. 40:1299(B)(2)(a), (b), and (c)."
Accordingly, the LPCF had a fair opportunity at trial to contest the amount requested by the plaintiff, but failed to refute these expenses. Accordingly, we conclude the trial court had authority to make a determination regarding the amounts owed for past medical care and to reduce those amounts to a money judgment and in light of the recent amendment, that portion of the special damage award shall be made executory.
Conclusion
In accordance with the foregoing analysis, the judgment of the trial court is affirmed in part and reversed in part.
AFFIRMED IN PART; REVERSED IN PART.