HIGGINBOTHAM, J.
|2The State of Louisiana, through the Department of Public Safety and Corrections (the State), appeals a judgment on a jury verdict that awarded damages to Linda E. Bass, for injuries she sustained in a motor vehicle accident caused by the State’s employee. For the following reasons, we affirm.
FACTS AND PROCEDURAL HISTORY
It is undisputed that on the evening of February 23, 2010, Linda E. Bass was injured when her car was struck by a pickup truck driven by the State’s employee, Leslie M. Dupont, Sr., after Mr. Du-pont failed to observe a stop sign at the intersection of Louisiana Highway 417 and Delhi Lane in Pointe Coupee Parish.[1] The collision caused Ms. Bass’s vehicle to leave the highway, hit a concrete culvert, become airborne, and hit the bank of a bayou before coming to a stop in a yard about thirty yards from the culvert. The door of her vehicle had to be cut before it could be opened, and when Ms. Bass attempted to stand up after exiting the vehicle, she collapsed face down onto the ground due to an excruciating, shooting pain in her back. She was immobilized on a spinal board and transported by ambulance to a hospital in Baton Rouge.
At the hospital, it was determined that Ms. Bass, who was 63 years old at the time, had sustained two “extremely painful” vertebral fractures in her lower (lumbar) spine at LI and L3 as a result of the accident. At LI, the fracture was a serious “burst type” compression fracture, where the bone was “splayed out in all directions, and pushed its way ... backwards against the spinal cord.” The second, less severe fracture at L3 was a “crush” type compression fracture “two levels below where the upper surface of the body of the vertebra has failed and has shown indentation!)]” A neurosurgeon, Dr. Gerald Wayne Molloy, was called to the |,.¡emergency room to evaluate and treat Ms. Bass. Dr. Molloy determined that there was no need for immediate surgery and that Ms. Bass could be treated conservatively by immobilizing her back with spinal support bracing and treating her constant pain. Within 24 hours of arriving at the hospital, Ms. Bass complained of severe pain between her shoulder blades, which could have been indicative of a cervical injury. However, Dr. Molloy’s initial treatment focused on stabilizing Ms. Bass’s low back fractures, her possible need for immediate low back surgery, and pain management.
Ms. Bass remained hospitalized and immobilized from the night of the accident, February 23, 2010, to March 3, 2010, at which time she was moved to a rehabilitation center, where she received conservative treatment until April 6, 2010. Even after returning home, Ms. Bass wore a hard back brace for nine months as she continued to heal, and she still wears a soft back brace at times. After the accident, Ms. Bass regularly used a walker for four months as she learned to walk again. Since the accident, Ms. Bass does not drive *715 and she has not been able to return to her job at a nursing home because she is physically unable to do the work that involves sitting and walking. It is unlikely that Ms. Bass will ever be able to return to work. She lives with constant pain between her shoulder blades, low back, and left leg, and she takes strong pain medication four times a day.
Dr. Molloy continued to treat Ms. Bass after she was released from the hospital to her home, seeing her in his office for the first time on May 25, 2010. At that time, Dr. Molloy noted that Ms. Bass was still in pain and she had weakness in her arms, another indication of a cervical injury. As part of Ms. Bass’s conservative treatment for cervical and low back pain, she was referred to a pain management specialist, Dr. John Michael Burdine, on June 17, 2010. Dr. Burdine adjusted Ms. Bass’s medications, ordered MRIs, and performed epidural steroid injections in Ms. Bass’s spine to reduce the inflammation and pain. She underwent 14two injections in her neck and three in her lower back. Dr. Molloy and Dr. Burdine both indicated that Ms. Bass is a candidate for back and neck surgery, but even with the surgeries-, it is apparent that she will more likely than not suffer from pain for the rest of her life due to the injuries she sustained in the accident.
Ms. Bass brought suit against the State for damages she sustained as a result of the accident. A four-day jury trial was held in March 2013. After the trial court granted a directed verdict against the State on the issue of liability, the matter proceeded to the jury solely on the issue of damages. The jury returned a verdict on March 21, 2013, awarding Ms. Bass the following damages: $1,300,000.00 for past and future pain, suffering, humiliation, mental anguish, and loss of enjoyment of life; $109,125.00 for past and future loss of earnings; $140,724.60 for past medical expenses; $500,000.00 for future medical expenses; and $136,000.00 for loss of household services.
Five months later, the trial court signed a judgment on August 30, 2013, noting that the general damage award was reduced to the mandated statutory cap of $500,000.00 pursuant to La. R.S. 13:5106(B)(1). In the judgment, the trial court also re-distributed the special damage award for future medical expenses, awarding $48,111.40 for medical expenses incurred due to Ms. Bass’s post-verdict/pre-judgment cervical fusion surgery, and the balance of the future medical expenses up to $451,888.60 to be paid through the Future Medical Care Fund (the Fund) as established in La. R.S. 39:1533.2 and La. R.S. 13:5106(B)(3)(c). Additionally, the judgment awarded costs and interest as allowed by law. The trial court subsequently denied the State’s motion for judgment notwithstanding the verdict (JNOV). The State now appeals, disputing the amount awarded for future medical expenses and household services, as well as challenging the trial court’s redistribution of the award for future medical expenses by ordering a portion of the ^expenses to be paid directly to Ms. Bass instead of the full amount to be paid through the Fund.
LAW AND ANALYSIS

Future Medical Expenses

The State is appealing the award of future medical expenses for Ms. Bass, which is subject to the manifest error standard of' review. Goza v. Parish of West Baton Rouge, 2008-0086 (La.App. 1st Cir.5/5/09), 21 So.3d 320, 337 n. 6, writ denied, 2009-2146 (La.12/11/09), 23 So.3d 919, cert. denied, 560 U.S. 904, 130 S.Ct. 3277, 176 L.Ed.2d 1184 (2010). The State also appeals the $500,000.00 amount awarded for future medical expenses, *716 which is subject to the abuse of discretion standard of review. Id. The State asserts that the evidence and testimony at trial indicated that Ms. Bass’s need for future surgery was speculative and her neck injuries were not related to the accident. Ms. Bass, on the other hand, relies on the collective expert testimony of Drs. Molloy and Burdine, who each testified that Ms. Bass would more than likely need both lumbar and cemeal spine surgery in the future. Further, Ms. Bass asserts that Dr. Molloy causally connected her neck and back injuries to the accident.
In order to recover future medical expenses, the appellate record must establish that future medical expenses will be necessary and inevitable. Jenkins v. State ex rel. Dept. of Transp. and Development, 2006-1804 (La.App. 1st Cir.8/19/08), 993 So.2d 749, 776, writ denied, 2008-2471 (La.12/19/08), 996 So.2d 1133. An award of future medical expenses will not be supported in the absence of medical testimony establishing by a preponderance of the evidence that they are indicated and setting out their probable cost. Id. However, an award for future medical expenses is inherently speculative and not susceptible of being calculated with mathematical certainty. See Menard v. Lafayette Ins. Co., 2009-1869 (La.3/16/10), 31 So.3d 996, 1006. Thus, when the record establishes that future | ¿medical expenses will be necessary and inevitable, courts should not reject the award because the record does not provide the exact value, if the court can determine from the record, past medical expenses, and other evidence a minimum amount that reasonable minds could not disagree would be required. In such cases, the court should award all future medical expenses that the medical evidence establishes the plaintiff, more probable than not, will, be required to incur. Goza, 21 So.3d at 337. Such awards generally “turn on questions of credibility and inferences, i.e., whose experts and other witnesses does the jury believe?” Menard, 31 So.3d at 1006 (quoting Frank L. Maraist & Thomas C. Galligan, Jr., Louisiana Tort, Law § 7.02, 7-4 (Michie 2009)).
With regard to new and pre-ex-isting injuries, a plaintiff must prove the existence of the injuries and a causal connection between the injuries and the accident. See Guillory v. Lee, 2009-0075 (La.6/26/09), 16 So.3d 1104, 1124. The test to determine whether that burden has been met is whether the plaintiff proved through medical testimony that it is more likely than not that the injuries, or aggravation of pre-existing injuries, were caused by the accident. Id. Much discretion is left to the jury in its assessment of quantum for future medical expenses. See La. Civ. Code art. 2324.1; Menard, 31 So.3d at 1006-07. In reviewing a jury’s factual conclusions regarding special damages such as future medical expenses, an appellate court must satisfy a two-step process based on the record as a whole in order to reverse: there must be no reasonable factual basis for the jury’s conclusion, and the finding must be clearly wrong. See Guillory v. Insurance Co. of North America, 96-1084 (La.4/8/97), 692 So.2d 1029, 1032. Notably, reasonable persons frequently disagree regarding the measure of damages in a particular case. Where there are two permissible views of the evidence, the jury’s choice between them cannot be manifestly erroneous. Menard, 31 So.3d at 1007:
|7In this case, the medical testimony and estimations of the probable cost of Ms. Bass’s future medical expenses came from Drs. Molloy and Burdine. Dr. Molloy is Ms. Bass’s treating physician and is an expert in neurosurgery. He testified that Ms. Bass’s cervical and back injuries are related to the accident, even though her *717 initial presentation was focused on the painful low back fractures. He stated that Ms. Bass’s complaint of significant and constant pain between her shoulder blades less than 24 hours after the accident, as well as the evident weakness in both of her arms a few months after the accident, were indications of a cervical injury caused by the accident. After conservative treatment that included epidural steroid injections in her back and neck began to lose its effectiveness, Dr. Molloy determined that Ms. Bass needed at least one and possibly two lumbar surgeries, as well as one cervical surgery to remove pressure on her nerves and to stabilize her spine. Dr. Molloy conservatively estimated the total cost of the three surgeries, if there were no complications, to be $245,000.00. While Dr. Molloy acknowledged that Ms. Bass’s medical records indicated that she had degenerative disc disease in her back and neck before the accident, he did not change his opinion that Ms. Bass is in need of surgery on her neck and back because of injuries she sustained in the accident.
The pain specialist, Dr. Burdine, deferred to Dr. Molloy as to the cause of Ms. Bass’s neck pain; however, he testified that Ms. Bass would more likely than not suffer from back and neck pain for the rest of her life, which at the time of trial was estimated to be another 21 years.[2] Dr. Burdine stated that Ms. Bass would likely continue to have persistent pain in the future, even if she underwent the surgeries recommended by Dr. Molloy, and that she would likely need to be treated for that pain. Dr. Burdine testified regarding pain medications that could cost over $1,000.00 per month, as well as the cost of physical therapy at $150.00 to $225.0018per appointment, and epidural steroid injections that cost $12,000.00 each. Additionally, Dr. Burdine discussed the $25,000.00 cost of a temporary spinal cord stimulator and $75,000.00 for a permanent stimulator. Dr. Burdine also testified about the possible need of a morphine pain pump to control Ms. Bass’s pain in the future.
The State presented evidence from an expert orthopedic surgeon, Dr. Kyle Girod, who conducted an independent medical examination of Ms. Bass one month before trial. Dr. Girod opined that Ms. Bass’s neck pain was not related to the accident, and that the recommended future neck surgery was not causally related to the accident. However, Dr. Girod agreed that Ms. Bass needed surgery on her back for injuries she sustained in the accident. Additionally, Dr. Girod testified that Ms. Bass would likely never be without back pain and that she would require future treatment for that pain, including pain medication and possibly a pain pump or spinal stimulator. Dr. Girod did not offer any contradictory cost estimates for the future medical expenses.
As is evident from its verdict of $500,000.00 for future medical expenses, the jury made a factual finding that Ms. Bass would continue to suffer from cervical and lumbar injuries related to the accident and would require some type of future medical treatment. Ms. Bass presented evidence of her future medical treatment, including three surgeries along with ongoing treatment for pain for the rest of her life with medication, physical therapy, spinal injections, and a spinal stimulator. The jury accepted the conservative cost estimates provided by Drs. Molloy and Burdine, while not specifically itemizing the components of the $500,000.00 award, The jury may accept or reject, in whole or in part, any expert’s view. See Harris v. State ex rel. Dept. of Transp. and Development, 2007-1566 (La.App. 1st *718 Cir.11/10/08), 997 So.2d 849, 866, writ denied, 2008-2886 (La.2/6/09), 999 So.2d 785. Furthermore, when opinions of expert witnesses Rdiff'er, it is for the jury to determine the most credible evidence and these determinations will not be overturned unless it is proven that the expert’s stated reasons are patently unsound. Brown v. City of Madisonville, 2007-2104 (La.App. 1st Cir.11/24/08), 5 So.3d 874, 881, writ denied, 2008-2987 (La.2/20/09), 1 So.3d 498. Given the evidence in the record, we cannot say that the jury’s award for future medical expenses was unreasonable and clearly wrong or that the amount awarded was an abuse of discretion. Accordingly, we find no merit in the State’s assignment of error regarding the future medical expense award.

Future Medical Care Fund

The State also assigns legal error to the trial court’s rendition of the judgment because it re-distributed the jury’s future medical expense award, contrary to the express language of La. R.S. 13:5106(B)(3)(c), to include medical expenses incurred post-verdict/pre-judgment in the money judgment rendered against the State. On March 21, 2013, the jury awarded $500,000.00 for future medical expenses; however, when the trial court signed its judgment five months later on August 30, 2013, the trial court re-distributed some of the future medical expenses to reflect that $48,111.40 was to be paid to Ms. Bass for the cost of her cervical fusion surgery that she underwent between the time of the verdict and the judgment. Accordingly, the trial court’s judgment ordered the State to pay Ms. Bass “[m]edieal expenses incurred post-verdict, until the date of this judgment in the amount of $48,111.40;” and “[fjuture medical expenses in the amount of $451,888.60 to be paid through the Future Medical Care Fund as authorized by [La.] R.S. 39:1533.2 and [La.] R.S. 13:5106[.]” The State maintains that the trial court legally erred, in that any suit for personal injury against the State requires that an award of future medical expenses be placed in a reversion-ary trust instrument known as “the Fund,” pursuant to the statutory mandate found in La. R.S. 13:5106(B)(3)(a) and (c), and should not be paid directly to Ms. Bass.
|inThis assignment of error involves the proper interpretation of a statute, which is a question of law. Our appellate standard of review for a question of law is de novo, without deference to the trial court’s legal conclusions. Cleco Evangeline, LLC v. Louisiana Tax Com’n, 2001-2162 (La.4/3/02), 813 So.2d 351, 353. The fundamental question in all cases of statutory interpretation is legislative intent. Moss v. State, 2005-1963 (La.4/4/06), 925 So.2d 1185, 1196.
The meaning and intent of a law is determined by considering the law in its entirety and all other laws on the same subject matter and by placing a construction on the law that is consistent with the express terms of the law and with the obvious intent of the legislature in enacting the law. Moss, 925 So.2d at 1196. Courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause or word as meaningless if a construction giving force to, and preserving, all words can legitimately be found. Id. It is presumed that the legislature acts with full knowledge of well-settled principles of statutory construction. Id. Louisiana Revised Statutes 1:3 provides, in pertinent part, that “[w]ords and phrases shall be read with their context and shall be construed according to the common and approved' usage of the language. Technical words and phrases ... as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to such peculiar and *719 appropriate meaning.” In addition, that statute directs that “[t]he word ‘shall’ is mandatory and the word ‘may’ is permissive.” Louisiana Revised Statutes 1:4 directs that, “[w]hen the wording of a Section is clear and free of ambiguity, the letter of it shall not be disregarded under the pretext of pursuing its spirit.” However, when the language of a law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law, which is sought by examining the context in which the words occur and the text of the law as a whole. La. Civ. Code arts. 10 and 12.
lnThe starting point in interpreting any statute is the language of the statute itself. Moss, 925 So.2d at 1197. Louisiana Acts 2000,1st Ex.Sess., No. 20, § 1, effective on July 1, 2000, amended La. R.S. 13:5106 to add subparagraph (B)(3)(c), which provides:
In any suit for personal injury against the state or a state agency wherein the court pursuant to judgment determines that the claimant is entitled to medical care and related benefits that may be incurred subsequent to judgment, the court shall order that all medical care and related benefits incurred subsequent to judgment be paid from the Future Medical Care Fund as provided in R.S. 39:1533.2. Medical care and related benefits shall be paid directly to the provider as they are incurred. Nothing in this Subparagraph shall be construed to prevent the parties from entering into a settlement or compro^ mise at any time whereby medical care and related benefits shall be provided but with the requirement that they shall be paid in accordance with this Subpara-graph. (Emphasis added.)
Louisiana Acts 2000, 1st Ex.Sess., No. 20, § 2, effective on July 1, 2000, enacted La. R.S. 39:1533.2 to provide for and establish the Fund referred to in La. R.S; 13:5106(B)(3)(c). Louisiana Revised Statutes 39:1533.2 states, in pertinent part, as follows:
A. There is hereby established in the state treasury the “Future Medical Care Fund”, hereinafter referred to as the “fund”. The fund shall consist of such monies transferred or appropriated to the fund for the purposes of funding medical care and related benefits that may be incurred subsequent to judgment rendered against the state or a state agency as provided by R.S. 13:5106 and as more specifically provided in R.S. 13:5106(B)(3)(c). All costs or expenses of administration of the fund shall be paid from the fund.
B. The fund shall be administered by the treasurer on behalf of the office of risk management for the benefit of claimants suing for personal injury who are entitled to medical care and related benefits that may be incurred subsequent to judgment. Except for costs or expenses of administration, this fund shall be used only for payment of losses associated with such claims. (Emphasis added.)
The issue before us is whether the trial court’s judgment complies with the express terms of the statute. This is a res nova issue in that apparently no other court has been called upon to interpret La. R.S. 13:5106(B)(3)(c) or La. R.S. |1¾39:153312 to determine whether, in suits against the State, future medical expenses incurred post-verdiet/pre-judgment must be paid directly to the medical provider from the Fund. Ms. Bass maintains that the $48,111.40 cost of the post-verdict surgery was actually akin to past medical *720 expenses since it was not incurred subsequent to the judgment; thus, she asserts that the trial court’s judgment ordering direct payment to her in a money judgment was appropriate. The State, on the other hand, argues that the medical providers are statutorily required to be paid directly from the Fund after future medical expenses are verified as necessary.
When it amended the statutory limitations for suits against the State in 2000, the legislature did not specifically provide for the situation sub judice, where some of the future medical expenses of the plaintiff in a suit against the State are incurred post-verdict, but pre-judgment. In contrast, our review of other regulatory schemes, specifically the Louisiana Medical Malpractice Act, reveals a different, and very explicit, provision for future medical care incurred post-verdict/pre-judgment. See Paulsell v. State, Dept. of Transp, and Development, 2012-0396 (La.App. 1st Cir.12/28/12), 112 So.3d 856, 862-863, writ denied, 2013-0274 (La.3/15/13), 109 So.3d 386. Louisiana Revised Statutes 40:1299.43(A)(1) was amended by La. Acts 2004, No. 181, § 1, to specifically provide that in all medical malpractice claims that proceed to trial, the jury shall be given a special interrogatory asking if the patient is in need of future medical care that will be “incurred after the date of the response to the special interrogatory,” and the amount of the future medical care. That statute further provides that “[o]nce a judgment is entered in favor of a patient who is found to be in need of future medical care and related benefits that will be incurred after the date of the response to the special interrogatory by the jury ... the patient may make a claim to the patient’s compensation fund through the board for all future medical care and related benefits[.]” (Emphasis added.) La. R.S. 40:1299.43(0). The |1smedical malpractice statute defines future medical care to encompass all past, present, and future medical and related services “incurred after the date of the injury up to the date of the ... judgment,” not just what is usually considered as future medical needs. See, La. R.S. 40:1299.43(B)(l)(a); Bickham v. Louisiana Emergency Medical Consultants, Inc., 2010-0535 (La.App. 1st Cir.11/1/10), 52 So.3d 162, 166.
The 2004 amendment to the Louisiana Medical Malpractice Act clarifies that future medical expenses already incurred at the time of judgment shall be included in the money judgment and made executory. See Willis v. Ochsner Clinic Foundation, 2013-627 (La.App. 5th Cir.4/24/14), 140 So.3d 338, 359. See also Steen v. Professional Liability Ins. Co. of America, 2006-1230 (La.App. 4th Cir.6/27/07), 962 So.2d 470, 479, writs denied, 2007-1570 and 2007-1590 (La.10/26/07), 966 So.2d 577 and 578. However, the legislature did not similarly amend or clarify the statute limiting liability in suits against the State in La. R.S. 13:5106, even though it could have done so when the statute was amended in 2005 and again in 2010. We recognize that the legislature is presumed to enact each statute with deliberation and full knowledge of all existing laws on the same subject. See Hays v. Louisiana State Bd. of Elementary and Secondary Educ., 2009-1386 (La.App. 1st Cir.6/11/10), 39 So.3d 818, 823, writ denied, 2010-1640 (La.10/8/10), 46 So.3d 1272. It is presumed that the legislature’s actions in crafting and amending a law were knowing and intentional. Id. Consequently, we presume that the legislature intentionally failed to include language in the amendments of La. R.S. 13:5106 that would require future medical expenses incurred post-verdict/pre-judgment to be paid through the Fund. See Rao v. Rao, 2005-1523 (La.App. 1st Cir.11/4/05), 927 So.2d *721 391, 392 (“it cannot be presumed that the legislature enacted and amended these statutes in ignorance” of the standard established and clarified in jurisprudence).
| uThus, we find there is no established statutory provision in place that applies to future medical expenses incurred between the time the jury’s verdict against the State is returned and the time that the judgment against the State is actually rendered and signed. The clear language of La. R.S. 13:5106(B)(3)(c) requires the trial court to order that all medical care expenses incurred subsequent to judgment be paid from the Fund directly to the provider as they are incurred. There is no statutory provision for post-verdict/prejudgment medical expenses. Accordingly, we conclude that the trial court did not legally err in ordering that $48,111.40 of the future medical expenses that were incurred post-verdict, but pre-judgment were not required to be paid through the Fund, but were to be included in the money judgment awarded to Ms. Bass. This assignment of error is without merit.

Loss of Household Services

The State further argues that the evidence does not support the jury’s $136,000.00 award to Ms. Bass for loss of household services; alternatively, the State maintains that the award was too high. Louisiana law allows, as an element of damages, reasonable housekeeping expenses necessitated by the incapacity of an injured person. Davis v. Foremost Dairies, 45,835 (La.App.2d Cir.2/16/11), 58 So.3d 977, 993, writs denied, 2011-0568 and 2011-0538 (La.4/25/11), 62 So.3d 97 and 98; Jenkins, 993 So.2d at 777. Moreover, the gratuitous nature of household services does not preclude the injured person from recovering the value of such services. Mims v. Reliance Ins. Co., 535 So.2d 1085, 1090 (La.App. 2d Cir.1988).
Ms. Bass testified that before the accident, she was very active. She worked full time, did all of her own housework, yard work and gardening, drove herself, and cooked. Since the day of the accident, she is not able to do any of those things because of her pain. Ms. Bass’s adult daughters, sister-in-law, and brother each testified about how strong and independent Ms. Bass was before the accident, and hsthey noted that she never asked for help. They also described all of the activities that Ms. Bass did around her house such as plumbing and carpentry work. They testified that she no longer drives since the accident, and she now struggles with everything around her house. They also indicated that simple trips to the grocery store are very difficult for Ms. Bass since the accident. Ms. Bass’s sister-in-law testified that she drives Ms. Bass to her doctor and physical therapy appointments, and she takes Ms. Bass to the store to pick up her medications.
Dr. Pat Culbertson, an expert in economics and earning capacity, testified regarding a value for the loss of household services that required Ms. Bass’s various family members to drive her to appointments and the grocery store. Based upon information provided to him, Dr. Culbertson estimated six hours per week were required for these services. He used the federal minimum wage rate of $7.25 per hour to come up with $2,262.00 per year, and he accounted for Ms. Bass’s life expectancy of 21 years. Dr. Culbertson also added travel expenses for gasoline at .60 per mile at 50 miles per week to compute a figure of $1,550.00 per year. Based upon his calculations, Dr. Culbertson arrived at a total value for household services of $68,235.00. Dr. Culbertson stressed that this was an estimate and he acknowledged that travel expenses and the need for household help could increase, as well as *722 the time required for traveling to and from doctor appointments.
Based on our review of the record, we conclude there is sufficient evidence in the record to support the jury’s finding that Ms. Bass sustained an actual pecuniary loss of household services due to her injuries and lifelong disability. Further, we do not find that the jury abused its discretion in awarding $136,000.00 for Ms. Bass’s loss of household services given the medical testimony outlining Ms. Bass’s permanent disability and her need for the future medical treatment that she will endure, necessitating even more help during her incapacity after each surgery. The evidence reveals that Ms. Bass completely relies on others to do what|1fishe previously did for herself around her house and yard. It was uncontradicted that Ms. Bass will need assistance for the remainder of her life. Thus, we find no error in the jury’s award for loss of household services or the amount awarded. This assignment of error is without merit.
CONCLUSION
For the reasons assigned, the judgment of the trial court is affirmed. Costs of this appeal in the amount of $6,762.00 are assessed to the State of Louisiana, through the Department of Public Safety and Corrections.
AFFIRMED.
McCLENDON, J., concurs in part and dissents in part and assigns reasons.

. Mr. Dupont was an employee of the State, through the Department of Public Safety and Corrections, who was assigned to work at the Louisiana State Penitentiary at Angola. The State was the owner of the vehicle operated by Mr. Dupont. The State did not strongly contest Mr. Dupont’s fault, and the trial court granted a directed verdict as to liability.

. An expert in economics, Dr. Pat Culbertson, testified regarding Ms. Bass’s life expectancy.